## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| HEALTHY GULF | ) | |
| AND | ) | |
| SIERRA CLUB | ) | |
|     *Petitioners*, | ) | |
| | ) | |
|   v. | ) | No. 23-1226 |
| | ) | |
| FEDERAL ENERGY REGULATORY | ) | |
| COMMISSION | ) | |
|     *Respondent*. | ) | |
| | ) | |

## PETITITON FOR REVIEW

Pursuant to Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b), Federal Rule of Appellate Procedure 15, and Circuit Rule 15, Healthy Gulf and Sierra Club hereby petition the United States Court of Appeals for the District of Columbia Circuit for review of the following order of the Federal Energy Regulatory Commission ("Commission"):

1. Order Issuing Certificate, *Driftwood Pipeline LLC*, FERC Docket No. CP21-465 (April 21, 2023), FERC Accession No. 20230421-3050, available at

https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20230421-3050&optimized=false and attached as Exhibit A.

All petitioners were intervenors in the Commission proceedings below.

Petitioners timely filed a request for rehearing of the Order Issuing Certificate on May 22, 2023, which FERC failed to respond to within 30 days. As such, petitioners' request for rehearing was deemed denied by operation of law, as FERC acknowledged in its Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration re Driftwood Pipeline LLC under CP21-465, FERC Accession No. 20230622-3009, available at

https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20230622-3009&optimized=false and attached as Exhibit B. Accordingly, this Court has jurisdiction to review the Order Issuing Certificate, pursuant to 15 U.S.C. § 717r(b).

This petition for review is timely filed, because FERC has not yet issued an order on the merits of the request for rehearing. *Env't Def. Fund v. FERC*, 2 F.4th 953, 972 (D.C. Cir. 2021), *cert. denied sub nom. Spire Missouri Inc. v. Env't Def. Fund*, 142 S. Ct. 1668 (2022). Moreover, this petition was filed within 60 days of the date the request for rehearing was deemed denied. 15 U.S.C. § 717r(b). Dated August 21, 2023.

Respectfully submitted,

***/s/* Nathan Matthews**
Nathan Matthews
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

**/s/ Rebecca McCreary**
Rebecca McCreary
Sierra Club
1650 38th Street, Suite 102W
Boulder, CO 80301
(305)449-5595
rebecca.mccreary@sierraclub.org

*Attorneys for Healthy Gulf and Sierra Club*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| HEALTHY GULF ) | |
| AND ) | |
| SIERRA CLUB ) | |
|     *Petitioners*, ) | |
| ) | |
| v. ) | No._____ |
| ) | |
| FEDERAL ENERGY REGULATORY ) | |
| COMMISSION ) | |
|     *Respondent*. ) | |
| _____) | |

## PETITITONERS' RULE 26.1 STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioners make the following disclosures:

**Healthy Gulf:** Healthy Gulf has no parent companies, and there are no publicly held companies that have a 10 percent or greater ownership interest in Healthy Gulf.

Healthy Gulf is a nonprofit corporation organized and existing under the laws of the State of Louisiana, dedicated to collaborating and serving with communities who love the Gulf of Mexico by providing the research, communications, and coalition-building tools needed to reverse the long pattern of over exploitation of the Gulf's natural resources.

**Sierra Club:** Sierra Club has no parent companies, and there are no publicly held companies that have a 10 percent or greater ownership interest in Sierra Club.

Sierra Club, a corporation organized and existing under the laws of the State of California, is a nonprofit organization dedicated to the protection and enjoyment of the environment.

Respectfully submitted,

*/s/* **Nathan Matthews**
Nathan Matthews
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

**/s/ Rebecca McCreary**
Rebecca McCreary
Sierra Club
1650 38th Street, Suite 102W
Boulder, CO 80301
(305)449-5595
rebecca.mccreary@sierraclub.org

*Attorneys for Healthy Gulf, Center for Biological Diversity, Louisiana Bucket Brigade, Sierra Club, and Turtle Island Restoration Network*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on August 21, 2023, I served

a copy of the foregoing Petition for Review and Corporate Disclosure Statement

by email on the following parties, including all members of the service list in

FERC Docket No. CP21-465, as indicated by

https://ferconline.ferc.gov/ServiceListResults.aspx?DocketNo=CP21-465.

These documents were also filed in the official FERC docket, publicly

accessible through FERC's eLibrary system.

Matthew Agen
Assistant General Counsel
American Gas Association
400 North Capitol St. NW
Washington, D.C. 20001
magen@aga.org

Katherine M Herrera
Regulatory Policy Analyst
American Gas Association
400 North Capitol St. NW
Washington, D.C. 20001
kherrera@aga.org

NGSA NGSA
Natural Gas Supply Association
900 17th Street NW
Suite 500
Washington, D.C. 20002
intervenor@ngsa.org

Taylor Johnson
Deputy General Counsel
Cheniere Energy, Inc.
PO Box Null
Houston, Texas 77002
taylor.johnson@cheniere.com

Janna Chesno
Assistant General Counsel
Cheniere Energy, Inc.
370 Van Gordon St.
Lakewood, Colorado 80228
janna.chesno@tallgrass.com

Karri Mahmoud
Director, Environmental and Re
Cheniere Energy, Inc.
700 Milam St. Ste 1900
Houston, Texas 77002
karri.mahmoud@cheniere.com

Erik Montague
Tellurian Inc.
1201 Louisiana Street
Suite 3100
Houston, Texas 77002
United States
Erik.Montague@tellurianinc.com

Isaac M Gregorie, JR
Partner
Kean Miller LLP
400 Convention Street
Suite 700
Baton Rouge, Louisiana 70802
mack.gregorie@keanmiller.com

Lisa Tonery
Attorney
Orrick, Herrington & Sutcliffe LLP
51 West 52nd St
New York, New York 10019
United States
ltonery@orrick.com

Mariah T Johnston
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
22nd Floor
New York, New York 10019
United States
mjohnston@orrick.com

Gregory Camet
Assistant General Counsel
Entergy Services, LLC
101 Constitution Avenue, N.W.
Suite 200 East
Washington, D.C. 20001
United States
gcamet@entergy.com

Andrea J Weinstein, ESQ
VP. Federal Regulatory Affairs
Entergy Services, LLC
101 Constitution Avenue, N.W.
Suite 200 East
Washington, D.C. 20001
United States
aweinst@entergy.com

Naomi Yoder
Science Review Specialist
1010 Common St., Ste 902
Healthy Gulf
New Orleans, Louisiana 70112
United States
naomi@healthygulf.org

Louis Robein
Attorney at Law
2540 Severn Ave Ste 400
Metairie, Louisiana 70002
United States
lrobein@ruspclaw.com

David Laborde
National Pipeline Director
International Brotherhood of Teamsters
25 Louisiana Ave NW
Washington, D.C. 20001
United States
DLaBorde@teamster.org

Robert Wilds
Director of Pipeline
International Union of Operating
Engineers, Washington, DC
1125 Seventeenth St. NW
Washington, D.C. 20036
United States
Rwilds@iuoe.org

Scott Strauss
Spiegel & McDiarmid LLP
1875 Eye Street NW
Suite 700
Washington, D.C. 20006
United States
Scott.Strauss@spiegelmcd.com

Stephen C. Pearson
Attorney
Spiegel & McDiarmid LLP
1875 Eye Street NW
Suite 700
Washington, D.C. 20006
United States
steve.pearson@spiegelmcd.com

E Service
Spiegel & McDiarmid LLP
1875 Eye St, NW
Suite 700
Washington, D.C. 20006
eService@spiegelmcd.com

Jerrod L Harrison
Assistant General Counsel
Sempra LNG, LLC
488 8th Avenue
HQ12
San Diego, California 92101
jharrison@SempraGlobal.com

Brett Snyder
Blank Rome LLP
1825 Eye St. NW
Washington, D.C. 20006
United States
brett.snyder@blankrome.com

Lamiya Rahman
Associate
Blank Rome LLP
1825 Eye St. NW
Washington, D.C. 20006
United States
lamiya.rahman@blankrome.com

Michael Tritico                           Anna Friedlander
RESTORE                                   O'Donoghue & O'Donoghue LLP
PO Box 233                                5301 Wisconsin Ave NW Ste 800
Longville, Louisiana 70652-0233           Washington, D.C. 20015
United States                             United States
michaeltritico@yahoo.com                  afriedlander@odonoghuelaw.com

Respectfully submitted,

*/s/* **Nathan Matthews**
Nathan Matthews
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

**/s/ Rebecca McCreary**
Rebecca McCreary
Sierra Club
1650 38th Street, Suite 102W
Boulder, CO 80301
(305)449-5595
rebecca.mccreary@sierraclub.org

*Attorneys for Healthy Gulf and Sierra Club,*

# Exhibit A

183 FERC ¶ 61,049
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
James P. Danly, Allison Clements,
and Mark C. Christie.

Driftwood Pipeline LLC                                    Docket Nos.  CP21-465-000
                                                                      CP21-465-001
                                                                      CP21-465-002

ORDER ISSUING CERTIFICATE

(Issued April 21, 2023)

1.      On June 17, 2021, and as amended on October 13 and October 29, 2021,[1] Driftwood Pipeline LLC (Driftwood Pipeline) filed an application pursuant to section 7(c) of the Natural Gas Act (NGA)[2] and Part 157 of the Commission's regulations[3] for a certificate of public convenience and necessity to construct and operate two new interstate natural gas pipelines (Line 200 and Line 300 Project) in Beauregard and Calcasieu Parishes, Louisiana.  The project is designed to provide nominal firm transportation service capacity[4] of up to 5,400,000 dekatherms per day (Dth/d), with a seasonal peak capacity of up to 5,700,000 Dth/d, to natural gas markets in the Lake Charles, Louisiana region.

2.      For the reasons discussed below, we grant the requested certificate authorization, as amended, subject to the conditions discussed below.

---

[1] The October 13, 2021 Amendment generally consisted of changes to accommodate the relocation of the proposed Indian Bayou Compressor Station.  The October 29, 2021 Amendment increased the nominal transportation capacity of the proposed project from 4,600,000 dekatherms per day (Dth/d) to 5,400,000 Dth/d, and increased the seasonal peak transportation capacity from 5,300,000 Dth/d to 5,700,000 Dth/d.

[2] 15 U.S.C. § 717f(c).

[3] 18 C.F.R. pt. 157 (2022).

[4] This refers to the non-peak, year-round capacity.

# I.    **Background and Proposal**

3.    Driftwood Pipeline, a Delaware limited liability company with its principal place of business in Houston, Texas, and registered to do business in the State of Louisiana, is a wholly-owned subsidiary of Tellurian, Inc.  Upon commencing operations,[5] Driftwood Pipeline will become a natural gas company within the meaning of section 2(6) of the NGA,[6] and, as such, will be subject to the jurisdiction of the Commission.

4.    Driftwood Pipeline proposes to construct and operate new interstate natural gas transmission facilities consisting of dual 42-inch-diameter pipelines (Line 200 and Line 300),[7] an electric compressor station with approximately 211,200 horsepower (hp) (Indian Bayou Compressor Station), eleven interconnects/meter stations, and appurtenant facilities.  The approximately 36.9-mile Line 200 pipeline would originate near Ragley, Louisiana, in Beauregard Parish at meter stations 1 and 2, which interconnect with Texas Eastern Transmission LP's pipeline system and Acadian Gas, LLC's pipeline system,[8] respectively.  Line 200 would then extend to the southwest to its terminus at meter station 12 near Carlyss, Louisiana, at the affiliated Driftwood LNG terminal.  Line 300 would originate at the proposed Indian Bayou Compressor Station at milepost 4.5 and be

---

[5] In April 2019, the Commission issued Driftwood Pipeline a certificate of public convenience and necessity to construct and operate a new interstate natural gas pipeline system (Driftwood Mainline System) located in Evangeline, Acadia, Jefferson Davis, and Calcasieu Parishes, Louisiana.  In conjunction, the Commission issued Driftwood LNG LLC (Driftwood LNG) an authorization under section 3 of the NGA to site, construct, and operate facilities for the liquefaction and export of natural gas at a liquefied natural gas (LNG) terminal in Calcasieu Parish, Louisiana.  *See Driftwood LNG LLC*, 167 FERC ¶ 61,054 (2019).  The Driftwood Mainline System consists of a new 96-mile-long mainline pipeline, a new 3.4-mile-long lateral pipeline, 15 new meter stations, and three new compressor stations, to provide up to 3,954,000 Dth/d of firm natural gas transportation service to make deliveries to the Driftwood LNG terminal for liquefaction and export.  The pipeline would interconnect with 14 interstate pipelines along its route.  Construction, and thus operation, has not yet commenced on the Driftwood Mainline System, and therefore Driftwood Pipeline has not yet become a natural gas company within the meaning of section 2(6) of the NGA.  15 U.S.C. § 717a(6).

[6] 15 U.S.C. § 717a(6).

[7] The Line 200 and Line 300 pipelines would be designed to operate at a maximum allowable operating pressure (MAOP) of 1,440 pounds per square inch gauge (psig).

[8] Acadian Gas, LLC is an intrastate natural gas pipeline company comprised of the Acadian, Cypress, and Evangeline pipeline systems located in Louisiana.

collocated with Line 200 for its entire 32.4-mile length, extending through Beauregard and Calcasieu Parishes and also terminating at meter station 12 at the Driftwood LNG terminal.[9]

5.      Driftwood Pipeline states that Line 300 will be offset from Line 200 by approximately 20 feet.  Additionally, both lines will be collocated within or abut existing disturbed corridors[10] for approximately 29.8 miles, or 81% of the total project length. Driftwood Pipeline asserts that where Line 200 and Line 300 are parallel to and abutting pipelines other than the Driftwood Mainline System, it will seek to maintain a minimum separation distance of 45 feet from the non-Driftwood pipelines' centerlines, unless otherwise approved by the other pipelines' operators.  Driftwood Pipeline states Line 200 and Line 300 have been sited parallel to, abutting, or collocated within other utilities or existing corridors except in areas where there are constructability constraints (for example, crossings of streams, wetlands, or congested areas) or where the route has been adjusted to minimize impacts on residential and commercial developments.

6.      Driftwood proposes to construct the project in two phases, and place it into service in three phases, as described below.  Facilities to be constructed as part of phase one consist of the following (Construction Phase 1):

- Line 200 in its entirety;

- Line 300 from approximate milepost 4.5 (i.e., the origination point for Line 300) to approximate milepost 5.6;[11]

- The 0.8-mile, 30-inch-diameter Transco Lateral;[12]

---

[9] A portion of the proposed project (9.8 miles total) will be collocated with the 48-inch-diameter pipeline certificated for the Driftwood Mainline System and offset by approximately 25 feet.

[10] The existing disturbed corridors contain rights-of-way associated with pipelines, utilities, public and private roads, and other infrastructure.

[11] Driftwood Pipeline states that it is constructing this segment of Line 300 concurrently with Line 200 to reduce construction risks to other pipelines and a landowner's pond.

[12] Transcontinental Gas Pipe Line Company, LLC (Transco) owns and operates an existing compressor station adjacent to meter station 5.  Driftwood Pipeline states that the Transco Lateral is a lateral pipe that is required to supply Transco-sourced gas from

Docket No. CP21-465-000, et al.                                                      - 4 -

- The 0.9-mile, 30-inch-diameter Sempra Lateral;[13]

- Indian Bayou Compressor Station, including 3 electric motor-driven compressors with a total of 158,400 hp of compression;

- 11 meter stations/interconnect facilities;[14] and

- A pig launcher and receiver and other appurtenant facilities associated with Line 200.

7.     Facilities to be constructed as part of phase two consist of the following (Construction Phase 2):

- The remainder of Line 300;

- One additional electric motor-driven compressor at the Indian Bayou Compressor Station to provide an additional 52,800 hp, resulting in a project total of 211,200 hp of compression; and

- A pig launcher and receiver and other appurtenant facilities associated with Line 300.

8.     Driftwood Pipeline states that project facilities will be placed in service in three phases.  The facilities associated with Construction Phase 1, except for the Line 300 segment, are targeted to be available for service in 2024 with a nominal transportation capacity of 3,100,000 Dth/d and a maximum seasonal transportation capacity[15] of 3,400,000 Dth/d (Operational Phase 1).  Driftwood Pipeline projects that the entirety of

---

meter station 5 into the suction side of the Indian Bayou Compressor Station, as further discussed below.

[13] The Sempra Lateral would extend from meter station 14 to the Indian Bayou Compressor Station; meter station 14 would be constructed adjacent to and interconnect with an existing compressor station owned and operated by Sempra, and the lateral would deliver natural gas to the Indian Bayou Compressor Station.  *See* final Environmental Impact Statement (EIS) at 2-4.

[14] In the amendments to its proposal, Driftwood Pipeline consolidated meter stations 6 and 10 into a single meter station referred to as meter station 14 and no longer proposes meter stations 6, 8, or 10.

[15] The seasonal peak transportation capacity reflects the fact that the project is able to operate more efficiently during cooler winter conditions.

Line 300 and appurtenant facilities will be available for service in the second quarter of 2026, bringing the project's nominal transportation capacity up to 4,400,000 Dth/d and its maximum seasonal transportation capacity up to 4,500,000 Dth/d (Operational Phase 2). It states that after the installation of the Construction Phase 2 compression, targeted to be available for service in late 2026, the project's nominal transportation capacity will be 5,400,000 Dth/d and its maximum seasonal transportation capacity will be 5,700,000 Dth/d (Operational Phase 3).

9.     In its October 13 Amendment, Driftwood Pipeline proposed modifications (which are incorporated into the project descriptions above) that were largely the result of relocating the proposed Indian Bayou Compressor Station.[16]  Driftwood Pipeline explained that during landowner negotiations regarding property for the original compressor station location, it learned that the property was no longer available.  The October 13 Amendment also proposed to relocate meter station 5 from the north side of the pipeline corridor to the south side of the corridor due to construction constraints. Driftwood Pipeline states that due to the relocation of both the Indian Bayou Compressor Station and meter station 5, a 0.8-mile 30-inch-diameter lateral pipe (Transco Lateral) is required to supply Transco-sourced gas from the relocated meter station 5 into the suction side of the relocated Indian Bayou Compressor Station.

10.     In its October 29 Amendment, Driftwood Pipeline states that as a result of design progression of the project, it was able to update hydraulic information and conduct more extensive and detailed modeling, which demonstrated that the planned use of electric-driven compression technology could enhance and increase flow capabilities through the pipeline more than originally projected.  Accordingly, it has increased the projected transportation capacity of the Line 200 and Line 300 Project from the originally proposed nominal capacity of 4,600,000 Dth/d to a nominal capacity of 5,400,000 Dth/d, with a new maximum seasonal capacity of 5,700,000 Dth/d.  The October 29 Amendment requests authorization to provide transportation service for up to the maximum seasonal capability of 5,700,000 Dth/d.  Driftwood Pipeline states that the increase in capacity does not require any additional facilities or modification to the facilities proposed in its original application, or as updated by the October 13 Amendment.  Additionally, Driftwood Pipeline states that the October 29 Amendment does not create any additional environmental impacts.

11.     Subsequently, on February 11, 2022, Driftwood Pipeline filed a response to a Commission staff request, identifying several other project modifications resulting from ongoing engineering and design of the pipeline route, in part due to negotiations with landowners and interconnecting pipeline operators.  The modifications include the

---

[16] Driftwood Pipeline also proposed changes to the meter stations and adjustments to the pipeline offsets near a leveed stock pond.

addition of the Sempra Lateral; changes to the proposed meter stations and changes to the Indian Bayou Compressor Station layout.

12.    Driftwood Pipeline estimates the total cost for the entire Line 200 and Line 300 Project to be approximately $1,525,405,257.[17]

13.    Driftwood Pipeline held a binding open season from March 29, 2021, to April 2, 2021, and a supplemental open season from December 14, 2021, to January 14, 2022, for the additional transportation capacity proposed in the October 29 Amendment.[18]  As a result of the open seasons, Driftwood Pipeline executed binding precedent agreements with Driftwood LNG as the foundation shipper, and with Sequent Energy Management LLC, and Entergy Louisiana, LLC.  The Driftwood LNG precedent agreement is a 20-year commitment for 5,000,000 Dth/d of firm transportation service.[19]  The Sequent Energy Management LLC and Entergy Louisiana, LLC precedent agreements are each for a contracted capacity of 100,000 Dth/d of firm transportation service.  As a result, the project is 96% subscribed based on the nominal transportation capacity.

## II.    Notice, Interventions, and Comments

14.    Notice of the application was issued June 30, 2021, and published in the *Federal Register* on July 7, 2021.[20]  The notice established July 21, 2021, as the deadline for filing comments and interventions.  Center For Liquefied Natural Gas, Natural Gas Supply Association, Port Arthur Pipeline, LLC (Port Arthur Pipeline), and Healthy Gulf, Sierra Club, and RESTORE (collectively Healthy Gulf) filed timely motions to intervene.[21]  Cheniere Creole Trail Pipeline, L.P., Driftwood LNG, and Entergy Services LLC filed untimely motions to intervene, which were granted by Secretary's Notice on

---

[17] Driftwood Pipeline October 29 Amendment at 5.

[18] *See* Driftwood Pipeline Application at 3; Driftwood Pipeline July 5, 2022 Data Response at 3.

[19] The service agreement with Driftwood LNG was originally for 4,600,000 Dth/d; however, on August 16, 2022, Driftwood Pipeline filed an amended and restated firm transportation service agreement with Driftwood LNG that increases the contracted for capacity to 5,000,000 Dth/d.  *See* Driftwood Pipeline February 14, 2023 Data Response at 3-4.

[20] 86 Fed. Reg. 35,776 (July 7, 2021).

[21] Timely, unopposed motions to intervene are granted by operation of Rule 214(c)(1) of the Commission's Rules of Practice and Procedure.  18 C.F.R. § 385.214(c)(1) (2022).

October 20, 2021. Healthy Gulf and Sierra Club together filed a protest in opposition to the project on July 21, 2021, which is discussed below. Driftwood Pipeline filed an answer to Healthy Gulf and Sierra Club's protest.[22] Although the Commission's Rules of Practice and Procedure do not permit answers to protests, we find good cause to waive our rules and accept the answer because it provides information that has assisted in our decision-making process.[23]

15.     Notice of the October 13 Amendment was issued October 20, 2021, and published in the *Federal Register* on October 26, 2021.[24] The notice established November 10, 2021, as the deadline for filing comments and interventions. No parties intervened in response to the October 13 Amendment.

16.     Notice of the October 29 Amendment was issued November 12, 2021, and published in the *Federal Register* on November 18, 2021.[25] The notice established December 3, 2021, as the deadline for filing comments and interventions. International Brotherhood of Electrical Workers Local Union No. 861, International Brotherhood of Electrical Workers Local Union No. 995, the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO, and the Laborers International Union of North America, the International Union of Operating Engineers, and the International Brotherhood of Teamsters (collectively, Indicated Unions) filed timely motions to intervene.

17.     Notice of availability of a draft Environmental Impact Statement (EIS) prepared by Commission staff was issued on May 13, 2022. The notice was published in the *Federal Register* on May 19, 2022,[26] establishing July 5, 2022, as the deadline to file comments on the draft EIS and interventions. The American Gas Association filed a timely motion to intervene.[27] We received several comments raising concerns over the need for and environmental impacts of the proposed project, as well as comments in

---

[22] Driftwood Pipeline August 5, 2021 Answer (Driftwood Pipeline Answer).

[23] *See* 18 C.F.R. § 385.213(a)(2) (2022).

[24] 86 Fed. Reg. 59,518 (Oct. 26, 2021).

[25] 86 Fed. Reg. 64,464 (Nov. 18, 2021).

[26] 87 Fed. Reg. 30,475 (May 19, 2022).

[27] Timely, unopposed motions to intervene are granted by operation of Rule 214(c)(1) of the Commission's Rules of Practice and Procedure. 18 C.F.R. § 385.214(c)(1).

support of the proposed project.  These comments are addressed in the final EIS and below.

## III.    Discussion

18.     Because Driftwood Pipeline's proposed pipeline facilities will be used to transport natural gas in interstate commerce subject to the jurisdiction of the Commission, the construction and operation of the facilities are subject to the requirements of subsections (c) and (e) of section 7 of the NGA.[28]

### A.     Certificate Policy Statement

19.     The 1999 Certificate Policy Statement provides guidance for evaluating proposals to certificate new construction.[29]  The 1999 Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest.  It explains that, in deciding whether to authorize the construction of new pipeline facilities, the Commission balances the public benefits against the potential adverse consequences.  The Commission's goal is to appropriately consider the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

20.     Under this policy, the threshold requirement for applicants proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers.  The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, and landowners and communities affected by the route of the new pipeline facilities.  If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects.  This is essentially an economic test.  Only when the benefits outweigh the

---

[28] 15 U.S.C. §§ 717f(c), (e).

[29] *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (1999 Certificate Policy Statement).  On March 24, 2022, the Commission issued an order converting the policy statements issued in February 2022 to draft policy statements.  *See Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,197 (2022) (Order on Draft Policy Statements).

adverse effects on economic interests will the Commission proceed to complete the environmental analysis where other interests are considered.

### 1.     No Subsidy Requirement

21.     As discussed above, the threshold requirement for applicants proposing new interstate gas pipeline facilities is that the pipeline must be prepared to financially support the project without relying on subsidization from its existing customers.  The Commission has consistently found that there is no potential for subsidization or degradation of service to existing customers on a greenfield pipeline because, by default, there are no existing customers on such a facility.[30]  Although the Commission issued Driftwood Pipeline a certificate of public convenience and necessity for the Driftwood Mainline System in 2019, construction on that project has not yet begun and the project has not been placed into service.  Therefore, because Driftwood Pipeline currently has no existing shippers or existing revenue base, there is no potential for subsidization on Driftwood Pipeline's system or degradation of service to existing customers.[31]

22.     However, even if the Mainline System is placed into service before the Line 200 and Line 300 Project (resulting in Driftwood Pipeline having existing customers on its system at the time this project would go into service), Driftwood Pipeline's proposal would still satisfy the requirement that it financially support the project without relying on subsidization from its existing customers.  The Commission has determined that, in general, where a pipeline proposes to charge incremental rates for new construction, the pipeline satisfies the threshold requirement that the project will not be subsidized by existing customers.[32]  Here, the Mainline System and the Line 200 and Line 300 Project do not share any facilities, and Driftwood Pipeline proposes stand-alone incremental recourse rates for the Line 200 and Line 300 Project's transportation service.  Driftwood Pipeline has designed the initial recourse rates for the Line 200 and Line 300 Project to ensure that the cost of the project, and the risks inherent in it, are borne by the project's customers.  Therefore, we affirm that there is no risk that the Mainline System customers would subsidize service on the Line 200 and Line 300 Project.

---

[30] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 32 (2017), *order on reh'g*, 163 FERC ¶ 61,197 (2018); *Atl. Coast Pipeline, LLC*, 161 FERC 61,042, at P 28 (2017), *order denying reh'g*, 163 FERC ¶ 61,098 (2018); *Sierrita Gas Pipeline, LLC*, 147 FERC ¶ 61,192, at P 23 (2014).

[31] *See, e.g., Southeast Supply Header*, *LLC*, 123 FERC ¶ 61,310, at P 10 (2008).

[32] *See, e.g.*, *Transcontinental Gas Pipe Line Corp.*, 98 FERC ¶ 61,155 (2002).

## 2. **Project Need**

23.    Driftwood Pipeline states that the Line 200 and Line 300 Project is designed to enhance and further diversify Driftwood LNG's access to natural gas supply, increasing the reliability and competitive pricing of its natural gas supply.[33]  In addition, Driftwood Pipeline notes that, when not being used to supply the terminal, the project, can improve the Lake Charles, Louisiana, area's ability to access supply from multiple natural gas production regions.[34]  Driftwood Pipeline states that there is a shortage of connectivity and optionality between the Lake Charles market area and the existing natural gas pipeline network located approximately 20 to 30 miles to the north.[35]  Driftwood Pipeline states that the project as designed will alleviate this constraint.[36]  Once constructed and placed in service, Driftwood Pipeline states that the project will offer a more economic and efficient pathway for the delivery of gas supplies to the Lake Charles area to serve the growing industrial, petrochemical, manufacturing, power generation, residential, and LNG markets.[37]

24.    As stated above, Driftwood Pipeline entered into precedent agreements for firm transportation service with three shippers for 96% of the project's nominal capacity.  We acknowledge that the foundation shipper, Driftwood LNG, has contracted for approximately 92% of capacity and is an affiliate of Driftwood Pipeline.[38]  Notwithstanding this relationship, we find, under the facts presented, that the precedent agreements demonstrate project need.  We note it is not an uncommon model for entities developing LNG terminals to construct and operate, through an affiliate, an associated pipeline to provide transportation and ensure delivery of the natural gas which will serve as feedstock for the liquefaction process.[39]  Further, LNG terminals, unlike, for example,

---

[33] *See* Driftwood Pipeline Application at 2.

[34] *Id.* at 11-13.

[35] *Id.* at 12.

[36] *Id.*

[37] *Id*.

[38] *See* Driftwood Pipeline February 14, 2023 Data Response.

[39] *See, e.g.*, *Corpus Christi Liquefaction Stage III, LLC*, 169 FERC ¶ 61,135 (2019), *order on reh'g*, 181 FERC ¶ 61,033 (2022); *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131 (2019), *order on reh'g*, 170 FERC ¶ 61,046 (2020); *Venture Global Plaquemines LNG, LLC*, 168 FERC ¶ 61,204 (2019); *Port Arthur LNG, LLC*, 167 FERC

affiliated local distribution companies, have no captive customers to whom they can pass the costs associated with their transportation contracts.  Accordingly, we find the pipeline's precedent agreement with its affiliate, Driftwood LNG, for 92% of the capacity to be significant evidence of project need.

25.    In addition to the information regarding precedent agreements subscribing capacity on the project, Driftwood Pipeline filed a market study titled "Analysis of Need for the Line 200 and Line 300 Project" (Market Study).[40]  The Market Study concludes that, while there is adequate supply and pipeline capacity to reach the area around Ragley and Gillis, Louisiana, the Lake Charles region further south would likely face pipeline constraints in the face of growing LNG feedgas demand and lack of sufficient pipeline infrastructure.[41]  The Market Study contends that the Line 200 and Line 300 Project would relieve expected pipeline constraints, and that the Lake Charles region has no viable options to source gas from lower-cost supply sources.[42]

26.    In its July 21, 2022 protest and July 5, 2022 comments on the draft EIS, Healthy Gulf and Sierra Club argue that the Line 200 and Line 300 Project is redundant with the already-approved Driftwood Mainline System because both projects would serve the Driftwood LNG terminal, and there is no need for the combined capacity of the previously approved pipeline system and this project.[43]  Healthy Gulf and Sierra Club assert that the Line 200 and Line 300 Project would merely replace existing capacity rather than meet a demonstrated increase in need or demand.[44]

27.    We disagree and find that Driftwood Pipeline has demonstrated a need for the Line 200 and Line 300 Project through the precedent agreements for 96% of the nominal capacity of the Line 200 and Line 300 Project, which enables beneficial elements not available on currently authorized facilities/systems.  Eight of the proposed interconnects of the Line 200 and Line 300 Project are not collocated with or parallel to the Driftwood Mainline System.  The two pipeline systems also have different origination points and

---

¶ 61,052 (2019); *Venture Global Calcasieu Pass, LLC*, 166 FERC ¶ 61,144 (2019) (orders granting authorizations under sections 3 and 7 of the NGA).

[40] Driftwood Pipeline September 20, 2021 Analysis of Need for the Line 200 and Line 300 Project (Market Study).

[41] *Id.* at 5.

[42] *Id.* at 5-6.

[43] *See* Healthy Gulf and Sierra Club July 5, 2022 Comment at 9.

[44] *Id.* at 8.

Docket No. CP21-465-000, et al.                                                    - 12 -

access to different pools of gas at differing pressures and supply availability.[45]  The Line 200 and Line 300 Project would offer bi-directional flow capabilities that the Driftwood Mainline system does not offer.[46]  In addition, we concur that the Market Study convincingly shows there is demand growth in the Lake Charles region and that most pipelines in the area do not have capacity to meet the expected growth.[47]  Thus, the Market Study concludes, and we agree, that the Line 200 and Line 300 Project would add reliability, flexibility, and liquidity to the region by alleviating capacity constraints anticipated to develop as a result of the addition of LNG terminals coupled with the potential expansion of the industrial and petrochemical sectors.  Entergy Louisiana, which is not a shipper on the Mainline System, has indicated that its project capacity will support the resilience and reliability of the natural gas supply plan for its local power plants in the Lake Charles area.  And while Driftwood LNG has not asserted that there is insufficient supply for its authorized exports, the Line 200 and Line 300 Project would provide the shipper with additional supply options, enhancing the diversity, resilience, and reliability of its supply.[48]  We therefore conclude that the Line 200 and Line 300 Project is required by the public convenience and necessity.

28.      Healthy Gulf and Sierra Club also argue that because Driftwood LNG, the owner and operator of the Driftwood LNG export terminal, is the foundation shipper for the project, its precedent agreement cannot be used to support a finding that the project is in the public convenience and necessity because supplying gas for LNG export is not in the public interest.  Specifically, Healthy Gulf and Sierra Club argue that the project's facilitating the export of LNG does not justify issuance of a certificate under section 7 of the NGA.[49]  Healthy Gulf and Sierra Club contend that gas that is exported is not distributed to the public or used by the public indirectly, and therefore it does not benefit

---

[45] Driftwood Pipeline Answer at 7-8.

[46] *Id.*

[47] Market Study at 26.

[48] Driftwood Pipeline August 12, 2022 Comment at 18.  We note the Mainline System interconnects with six pipeline systems (ANR Pipeline, Cameron Pipeline, Egan Pipeline, Texas Gas Pipeline, Pine Prairie Pipeline, and Columbia Gulf Transmission) that the Line 200 and Line 300 Project does not, and the Line 200 and Line 300 Project interconnects with four pipeline systems (Acadian Pipeline, Louisiana Energy Access Pipeline, Gulf South Pipeline, and Sempra Gillis Pipeline) that do not interconnect with the Mainline System.

[49] *See* Healthy Gulf and Sierra Club July 21, 2021 Protest at 3; July 5, 2022 Comment at 20.

the public under the NGA.[50]  We are unconvinced by Healthy Gulf and Sierra Club's argument.  NGA section 7 vests the Commission with jurisdiction over the transportation and wholesale sale of natural gas in interstate commerce.[51]  Before a company can construct a natural gas pipeline, it must obtain approval from the Commission under NGA section 7(e), which provides that the Commission "shall" issue a certificate if it determines that a proposed pipeline "is or will be required by the present or future public convenience and necessity."[52]

29.    In *City of Oberlin*, the D.C. Circuit affirmed the Commission's reasoning that it is lawful under section 7 of the NGA to credit foreign export precedent agreements to establish project need.[53]  The court noted that the Commission "could lawfully consider the export precedent agreements" because a public convenience and necessity determination requires consideration of "all the factors that might bear on the public interest."[54]  It is worth noting that Driftwood LNG Terminal is authorized by the Department of Energy to export LNG to countries with which the United States has a Free Trade Agreement (FTA) as well as to non-FTA countries.[55]  As Driftwood Pipeline explained, and as discussed, "the Project provides the Driftwood LNG Terminal with additional capacity and supply options" and "access to a highly liquid, diverse supply aggregation point that is not connected to the Driftwood Pipeline," which will "provid[e] the Driftwood LNG Terminal with added diversity, resilience and reliability of supply" and allow for "optionality and flexibility [to] reduce gas service disruptions at the Driftwood LNG Terminal during maintenance and inspection activities of the Driftwood

---

[50] *See* Healthy Gulf and Sierra Club July 5, 2022 Comment at 21-22.

[51] 15 U.S.C. § 717(a).

[52] *Id.* § 717f(e).  If the Commission grants a certificate of public convenience and necessity, the NGA authorizes the certificate holder to exercise eminent domain authority.  *Id.* § 717f(h).

[53] *See City of Oberlin, Ohio v. FERC*, 39 F.4th 719, 725-26 (D.C. Cir. 2022) (holding "that FERC's consideration of export precedent agreements as part of its Section 7 analysis was . . . lawful" and that "[n]othing in Section 7 prohibits considering export precedent agreements in the public convenience and necessity analysis.").

[54] *Id*.  We note that the Supreme Court has explained that "the use of the words 'public interest' in a regulatory statute . . . take[s] meaning from the purposes of the regulatory legislation."  *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976).

[55] *Driftwood LNG LLC*, FE Docket No. 16-144-LNG, Order No. 3968 (Feb. 28, 2017); *Driftwood LNG LLC*, FE Docket No. 16-144-LNG, Order No. 4373 (May 2, 2019).

Pipeline, and reduce the risk of outages from operational issues further upstream."[56]
Given Congress' mandate in NGA section 3 that exports to a free trade partner are
deemed to be in the public interest,[57] we believe that when considering a proposed project
under section 7, it is appropriate to credit precedent agreements for transportation of gas
volumes to facilities exporting LNG to countries with an FTA as supporting a public
convenience and necessity finding.[58]  Specifically, because the project will further the
reliability of supply for such an export facility, i.e., one that exports LNG to countries
with a FTA, we find further support for our determination that there is a demonstrated
need for the project based on the precedent agreements.

30.     Moreover, the Line 200 and Line 300 Project would serve two other shippers in
addition to Driftwood LNG, and it would help alleviate capacity constraints in the Lake
Charles market, as explained above. We find that these benefits support our conclusion
that the precedent agreements demonstrate a need for the project.

31.     Healthy Gulf and Sierra Club further question whether the Line 200 and Line 300
Project pipelines would be transporting gas in interstate commerce, speculating that the
gas will mostly or entirely be produced in Louisiana.[59]  Healthy Gulf and Sierra Club's
assertion is unsupported.  As explained above, the construction and operation of pipeline
facilities that will be used to transport natural gas in interstate commerce is subject to the
Commission's jurisdiction under section 7 of the NGA.[60]  The NGA defines interstate
commerce as "commerce between any point in a State and any point outside thereof, or
between points within the same State but through any place outside thereof . . . ."[61]  The
Line 200 and Line 300 Project has proposed interconnects that will receive gas from and
deliver gas to numerous interstate pipelines.[62]  The project will receive interstate gas into
its system for redelivery to the Lake Charles market and other potential domestic

---

[56] Driftwood Pipeline August 12, 2022 Comment at 18.

[57] "Congress has provided that the import or export of gas to or from 'a nation
with which there is in effect a free trade agreement requiring national treatment for trade
in natural gas[ ] shall be deemed to be consistent with the public interest.'"  *City of
Oberlin*, 39 F.4th at 723 (quoting 15 U.S.C. § 717b(c)).

[58] *See NEXUS Gas Transmission, LLC*, 172 FERC ¶ 61,199, at P 14 (2020).

[59] Healthy Gulf and Sierra Club July 5, 2022 Comment at 20-21.

[60] 15 U.S.C. §§ 717f(c), (e).

[61] *Id.* § 717(a)(7).

[62] Driftwood Pipeline July 5, 2022 Data Response at attach. 1.

destinations outside of Louisiana through interconnects with other interstate pipelines, making it an interstate pipeline subject to section 7 jurisdiction.

32.     Finally, Healthy Gulf and Sierra Club argue that Driftwood Pipeline must file public versions of its precedent agreements that redact only the specific material claimed to be privileged so that the public can assess information about market support.[63] Healthy Gulf and Sierra Club further assert that Driftwood Pipeline failed to include in its application an Exhibit H regarding gas supply and an Exhibit I regarding market data.[64] Regarding the precedent agreements filed as privileged materials, the Commission's regulations establish a process by which parties to a proceeding may obtain privileged materials.[65]  Pursuant to these regulations, Driftwood Pipeline included in its application a proposed form of protective agreement for the material that it files as privileged, including the precedent agreements.[66]  A party to the proceeding, such as Healthy Gulf and Sierra Club, may obtain a copy of privileged materials by making a written request to Driftwood Pipeline that includes an executed copy of the protective agreement and a copy of their motion to intervene.[67]  There is no evidence in the record that Healthy Gulf and Sierra Club made this request to Driftwood Pipeline.  Additionally, the identities of the parties to the agreements and the contracted capacity are publicly available in the record.[68]  As to Exhibits H and I, the Commission's regulations provide that a company may file an abbreviated application and omit certain exhibits when those exhibits are not necessary to fully disclose the nature of the proposal.[69]  Exhibit H provides for information on total gas supply, specifically a description of the production areas accessible that contain existing or potential supplies for the proposed project.[70]  However since the advent of open access, natural gas shippers, not natural gas pipelines, have been responsible for obtaining natural gas supplies, and therefore, Exhibit H is not needed to

---

[63] Healthy Gulf and Sierra Club July 21, 2021 Protest at 1-2; Healthy Gulf and Sierra Club July 5, 2022 Comment at 5.

[64] Healthy Gulf and Sierra Club July 5, 2022 Comment at 5-6.

[65] 18 C.F.R. § 388.112(b)(2) (2022).

[66] Driftwood Pipeline Application at Ex. Z-1; *see* 18 C.F.R. § 388.112(b)(2)(i).

[67] 18 C.F.R. § 388.112(b)(2)(iii).

[68] *See* Driftwood Pipeline February 14, 2023 Data Response.

[69] 18 C.F.R. § 157.7 (2022).

[70] *Id.*. § 157.14(a)(11) (2022).

determine whether adequate natural gas is available to supply the proposed project.[71] Information on total gas supply is not necessary to complete our public convenience and necessity analysis. Regarding the market data described in the regulations for Exhibit I, it has not been the Commission's practice to reject as deficient an application for failure to include the market data specified in the Commission's regulations.[72] Here, Driftwood Pipeline filed its precedent agreements and the Market Study, which provides market data, in support of its proposal. As discussed above, we find a demonstrated need for the project.

### 3. Impacts on Existing Customers, Existing Pipelines and Their Customers, and Landowners and Surrounding Communities

33. As discussed above, Driftwood Pipeline does not currently have existing customers. We also find that there will be no adverse impact on other pipelines or their customers, and the project will not affect service on the previously authorized Mainline System. The project is not intended to replace service on other pipelines, and no pipeline company or their captive customers have protested Driftwood Pipeline's application. Port Arthur Pipeline filed comments on the draft EIS noting that 19 miles of the Line 200 and Line 300 Project would be parallel to, abut, or be collocated with Port Arthur Pipeline's Louisiana Connector Project.[73] Port Arthur Pipeline states that construction of these projects could overlap, and Driftwood Pipeline and Port Arthur Pipeline are in discussions about possibly swapping right-of-way corridors.[74] Port Arthur Pipeline requests that the Commission provide that any request by either Port Arthur Pipeline or Driftwood Pipeline to effectuate a right-of-way swap may be obtained by the parties through a variance request and a delegated order issued by Commission staff.[75] We decline to prejudge any possible proposed change in right-of-way that is not currently before us.

---

[71] *Fla. Se. Connection, LLC,* 154 FERC ¶ 61,080, at P 56 (2016), *vacated on other grounds sub nom*, *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017)

[72] *E. Shore Nat. Gas Co.*, 132 FERC ¶ 61,204, at P 13 (2010).

[73] The Commission issued a certificate of public convenience and necessity for the Louisiana Connector Project in 2019, and a subsequent order amending the certificate to permit the relocation of compression and other facilities in 2020. *See Port Arthur LNG, LLC*, 167 FERC ¶ 61,052 (2019); *Port Arthur Pipeline, LLC*, 173 FERC ¶ 61,073 (2020). The Louisiana Connector Project has not been placed into service.

[74] Port Arthur Pipeline July 5, 2022 Comment at 3-5.

[75] *Id.* at 5.

34.    We are also satisfied that Driftwood Pipeline has taken appropriate steps to minimize adverse impacts on landowners and surrounding communities.  Approximately 81% of the pipeline route will be collocated within or adjacent to existing pipeline, roadway, or utility rights-of-way corridors, although some of the remaining portion of the route will cross private land.  For purposes of our consideration under the Certificate Policy Statement, we find that Driftwood Pipeline has taken sufficient steps to minimize impacts on landowners and surrounding communities.

35.    In considering the record, we find that the construction and operation of the project will provide enhanced supply access to the natural gas market in the Lake Charles region beyond that provided by the Driftwood Mainline System or other pipelines in the area.  Driftwood Pipeline's executed precedent agreements with Driftwood LNG, Sequent Energy Management LLC, and Entergy Louisiana, LLC for 96% of the nominal project capacity demonstrate market need.  Further, the project will not have adverse effects on existing customers or other pipelines and their captive customers, and will have minimal adverse impacts on landowners and surrounding communities.  Therefore, we conclude that the project is consistent with the 1999 Certificate Policy Statement and analyze the environmental impacts of the project below.

### B.    Rates

#### 1.    Initial Rates

36.    Driftwood Pipeline proposes to offer both firm and interruptible transportation services on the project and proposes to use separate stand-alone transportation rates for transportation services on the project facilities.  It proposes to offer firm transportation service under Rate Schedule FTS-1, short-term firm transportation service under Rate Schedule STFTS-1, interruptible transportation service under Rate Schedule ITS-1, parking and lending service under Rate Schedule PALS-1, and interruptible wheeling services under Rate Schedule WS-1.  Driftwood Pipeline states that it calculated the new stand-alone rates using a straight-fixed variable rate design.

37.    Driftwood Pipeline also proposes separate rates for the project's Operational Phase 1, Operational Phase 2, and Operational Phase 3, with Operational Phase 3 reflecting full in-service of all project facilities.  Driftwood Pipeline estimates that the costs will be approximately $801,976,253 for the facilities associated with Operational Phase 1; $521,956,112 for the facilities associated with Operational Phase 2; and $201,472,892 for the facilities associated with Operational Phase 3; totaling $1,525,405,257 for the entire project.[76]

---

[76] October 29 Amendment at Ex. K.

38.     Upon the completion of Operational Phase 1, Driftwood Pipeline proposes an initial incremental cost-based reservation charge of $4.5405 per Dth, a usage charge of $0.0012 per Dth, and an overrun charge of $0.1504 per Dth under Rate Schedules FTS-1 and STFTS-1.[77]  For the same operational phase, Driftwood Pipeline proposes an interruptible rate of $0.1504 per Dth[78] under Rate Schedules ITS-1, PALS-1, and WS-1.[79] Driftwood Pipeline calculated these rates based on its year-one fixed cost of service of $168,905,425, variable cost of $1,327,241, and annual billing determinants of 3,100,000 Dth/d.

39.     Upon the completion of Operational Phase 2, Driftwood Pipeline proposes an initial incremental cost-based reservation charge of $4.9974 per Dth, a usage charge of $0.0025 per Dth, and an overrun charge of $0.1668 per Dth under Rate Schedules FTS-1 and STFTS-1.  For the same operational phase, Driftwood Pipeline proposes an interruptible rate of $0.1668 per Dth under Rate Schedules ITS-1, PALS-1, and WS-1. Driftwood Pipeline calculated these rates based on its combined Operational Phase 1 and 2 fixed cost of service of $203,922,110, variable cost of $1,459,323, and annual billing determinants of 4,400,000 Dth/d.

40.     Upon the completion of the entire project, Operational Phase 3, Driftwood Pipeline proposes an initial incremental cost-based reservation charge of $4.6774 per Dth, a usage charge of $0.0021 per Dth, and an overrun charge of $0.1559 per Dth under Rate Schedules FTS-1 and STFTS-1.  For the completed project, Driftwood Pipeline proposes an interruptible rate of $0.1559 per Dth under Rate Schedules ITS-1, PALS-1, and WS-1.  Driftwood Pipeline calculated these rates based on its combined Operational Phase 1, 2, and 3 fixed cost of service of $304,222,781, variable cost of $4,090,319, and annual billing determinants of 5,400,000 Dth/d.

41.     Driftwood Pipeline's cost of service uses a 25-year depreciation life as reflected in the proposed depreciation rate of 4.0%.[80]  Driftwood Pipeline proposes to use a capital structure of 50% equity and 50% debt and a return on equity (ROE) of 14.5%.  Driftwood Pipeline states that its proposed ROE of 14.5% is not based on Driftwood Pipeline's approved ROE for the Driftwood Mainline System, which is 14%.  Driftwood Pipeline

---

[77] Driftwood Pipeline March 29, 2022 Data Request Response at 3, Revised Ex. P. All three phases together total the 5,400,000 Dth/d proposed in the amended application.

[78] Driftwood Pipeline proposes to include interruptible transportation revenue credits to the system cost of service of $500,000 for Operational Phase 1.

[79] Application at Ex. P, at 1.  All of these rates are based on the 100% load factor rate of the FTS-1 reservation rate.

[80] Driftwood Pipeline September 30, 2021 Data Request Response at 2.

explains that although the Driftwood Mainline System and the proposed Driftwood Pipeline Line 200 and Line 300 Project have a common interconnect at the Driftwood LNG terminal, the Line 200 and Line 300 Project provides other services and connectivity to other markets that are broader than and in addition to the Driftwood LNG terminal. Therefore, these services and the additional costs incurred to provide the services require additional capital and add additional development risk to Driftwood Pipeline that are above the costs and risks associated with Driftwood Mainline System, justifying a slightly higher ROE to balance the risk versus the investment. Driftwood Pipeline states the proposed 14.5% ROE is necessary given the underlying regulatory and commercial risks related to the project. Driftwood Pipeline further states that its proposed ROE of 14.5% is consistent with proposals by other pipelines in Commission proceedings and is reflective of the cost of equity of the project sponsor.[81]

42.    For new greenfield pipelines[82], the Commission has traditionally approved an ROE of up to 14% as long as the equity component of the capitalization is no more than 50%.[83] Although the Commission has traditionally required pipelines to use for subsequent expansions either 1) their last approved ROE, or 2) the last litigated ROE the Commission has approved, we do not believe that to be appropriate here, where Driftwood Pipeline is constructing additional facilities before it has gone into service.[84] Though the Line 200 and Line 300 Project is an extension from the previously certificated Driftwood Mainline System, the Driftwood Mainline System is not yet in service. Thus, just as was the case when it proposed its initial Mainline System, Driftwood Pipeline is not an established pipeline company and has no existing revenue base. Without cash flows from existing operations and a proven track record, we find that, with respect to the Line 200 and Line 300 Project, Driftwood Pipeline faces a capital funding outlook similar to other companies constructing new pipeline systems. However, Driftwood Pipeline has not provided sufficient support for why the Commission should deviate from its policy of a 14% ROE for new projects, and we decline to approve an ROE of 14.5%.[85] Rather, we will approve the use of a 14% ROE for this project.

---

[81] *Id.*

[82] A "greenfield pipeline" refers to a new, standalone pipeline system proposed to be constructed and operated by an entity not currently a natural gas company.

[83] S*ee, e.g.*, *Nexus Gas Transmission, LLC*, 160 FERC ¶ 61,022, at P 81 (2017); *Fla. Se. Connection, LLC*, 154 FERC ¶ 61,080 (2016).

[84] *See Mountain Valley Pipeline, LLC*, 171 FERC ¶ 61,232, *order on reh'g* 172 FERC ¶ 61,261 (2020).

[85] *See, e.g.*, *Sonora Pipeline, LLC*, 120 FERC ¶ 61,032, at P 26 (2007).

Therefore, we will require Driftwood Pipeline to revise its proposed incremental recourse rates using an adjusted overall rate of return reflecting this revised ROE.

43.     We have reviewed Driftwood Pipeline's proposed cost of service and rates and find that they reasonably reflect current Commission policy, as modified above.

### 2.     Fuel

44.     Driftwood Pipeline states that its project will have no impact on its current system fuel usage percentage.  Driftwood Pipeline proposes to establish a separately stated fuel rate, inclusive of lost and unaccounted for gas (L&U), to apply exclusively to the shippers using the project facilities.  Driftwood Pipeline proposes a fuel rate of 0.66% for Operational Phase 1, 0.82% for Operational Phases 2 and 3, and 0.59% for all Operational Phases (Operational Phase 1, 2 and 3, respectively) and an L&U rate of 0.25%.[86]  Driftwood Pipeline proposes to add L&U to each Operational Phase's fuel percentage.

45.     Driftwood Pipeline states that it designed the Indian Bayou Compressor Station to be powered by electricity from the existing power grid.  However, Driftwood Pipeline states that while the local electricity provider constructs the necessary infrastructure to provide service to the Indian Bayou Compressor Station, the electric motors at the Indian Bayou Compressor Station will be fired by two gas-fired power generation units, which subsequently will be used for back-up in the event of power outages.  Driftwood Pipeline states that the cost per month for the electricity was developed from a fuel study provided by a major local energy provider.  In addition, Driftwood Pipeline states that section 6.15 of the proposed Driftwood Pipeline tariff contains an adjustment provision to ensure that there are no gains or losses on fuel for Driftwood Pipeline or its shippers.[87]  Driftwood Pipeline further states that the fuel percentage for the project will be separately determined from the current system by associating the estimated cost of electricity for the compression and the cost of gas.  Driftwood Pipeline asserts that it has evaluated the potential effect of the project on the overall system fuel consumption and has determined that existing shippers will not subsidize the fuel costs attributable to the project.[88]

46.     Based on Driftwood Pipeline's September 30, 2021 Data Response, it appears Driftwood Pipeline is establishing its fuel rates for the project based on converting the electric costs that it pays into dekatherms.  However, the *pro forma* tariff records Driftwood Pipeline filed provide no information about how this process will occur.

---

[86] Driftwood Pipeline September 30, 2021 Data Request Response at 3.

[87] *Id.* at 4.

[88] *Id.*

Additionally, Driftwood Pipeline's proposed fuel mechanism for the Line 200 and Line 300 Project does not appear to comply with section 6.15 of its *pro forma* tariff approved in Docket No. CP17-118-000. Section 6.15 states that "to the extent Transporter installs compression facilities powered by electricity or other facilities and Transporter incurs costs relating to the provision of electric service, Transporter shall establish an Electric Charge Adjustment which will recover the actual costs of providing such electricity service."

47.     Therefore, based on the above reasons, we reject Driftwood Pipeline's proposed initial fuel retention percentages for the project.

### 3.    Negotiated Rates

48.     Driftwood Pipeline's *pro forma* tariff provides for Driftwood Pipeline to charge negotiated rates for its proposed services. Driftwood Pipeline proposes to provide service to the project shippers under a negotiated rate transportation agreement. Driftwood Pipeline must file either its negotiated rate agreement or a tariff record setting forth the essential elements of the agreements in accordance with the Commission's Alternative Rate Policy Statement[89] and the Commission's negotiated rate policies.[90]

### 4.    Reporting

49.     Section 154.309 of the Commission's regulations includes bookkeeping and accounting requirements applicable to all expansions for which incremental rates are charged. The requirements ensure that costs are properly allocated between pipelines' existing shippers and incremental expansion shippers.[91] Therefore, we will require Driftwood Pipeline to keep separate books and accounting of costs and revenues attributable to the proposed incremental services and capacity created by the Line 200

---

[89] *Alts. to Traditional Cost-of-Service Ratemaking for Nat. Gas Pipelines; Regul. of Negotiated Transp. Servs. of Nat. Gas Pipelines*, 74 FERC ¶ 61,076, *order granting clarification*, 74 FERC ¶ 61,076, *order granting clarification*, 74 FERC ¶ 61,194, *order on reh'g & clarification*, 75 FERC ¶ 61,024, *reh'g denied*, 75 FERC ¶ 61,066, *reh'g dismissed*, 75 FERC ¶ 61,291 (1996), *petition denied sub nom. Burlington Res. Oil & Gas Co. v.* FERC, 172 F.3d 918 (D.C. Cir. 1998) (Alternative Rate Policy Statement).

[90] *Nat. Gas Pipeline Negotiated Rate Policies & Pracs.; Modification of Negotiated Rate Pol'y*, 104 FERC ¶ 61,134 (2003), *order on reh'g & clarification*, 114 FERC ¶ 61,042, *dismissing reh'g & denying clarification*, 114 FERC ¶ 61,304 (2006).

[91] 18 C.F.R. § 154.309 (2022).

and Line 300 Project as required by section 154.309 of the Commission's regulations.[92] The books should be maintained with applicable cross-reference and the information must be in sufficient detail so that the data can be identified in Statements G, I, and J in any future NGA section 4 or 5 rate case, and the information must be provided consistent with Order No. 710.[93]

## 5.    Tariff

50.    Driftwood Pipeline states that the proposed transportation services associated with the project will be provided pursuant to Driftwood Pipeline's FERC Gas Tariff, as approved by the Commission in Docket No. CP17-118-000, subject to modifications proposed in the instant proceeding.  In the instant proceeding, Driftwood Pipeline filed *pro forma* tariff records to allow it to establish a wheeling service, as well as short-term firm service, both of which will be made available on an open-access basis.  To implement the proposed project and new services, Driftwood Pipeline proposes new *pro forma* Rate Schedules FTS-1, STFTS-1, ITS-1, PALS-1, and WS-1, consistent with the project's three operational phases.  Additionally, Driftwood Pipeline filed new *pro forma* form of service agreements for each rate schedule.  We have reviewed Driftwood Pipeline's proposed tariff revisions and find they are consistent with current Commission policy.

## C.    Environmental Analysis

51.    On January 13, 2022, the Commission issued a *Notice of Intent to Prepare an EIS for the Proposed Line 200 and Line 300 Project, Request for Comments on Environmental Issues, and Schedule for Environmental Review*.  The notice was published in the *Federal Register*[94] and mailed to interested entities, including affected landowners (as defined in the Commission's regulations); federal, state, and local officials; Native American Tribes; agency representatives; environmental and public interest groups; and local libraries and newspapers.  Commission staff conducted two public scoping sessions on January 25 and January 27, 2022, to provide an opportunity for agencies and the general public to learn more about the project and to participate in the environmental analysis by identifying issues and concerns about Driftwood Pipeline's proposal.  The Commission received four oral comments and several written comment letters during the scoping period and prior to issuance of the draft EIS.

---

[92] *Id.*

[93] *See Revisions to Forms, Statements, & Reporting Requirements for Nat. Gas Pipelines*, Order No. 710, 122 FERC ¶ 61,262, at P 23 (2008).

[94] 87 Fed. Reg. 3101 (Jan. 20, 2022).

52.     Pursuant to the National Environmental Policy Act of 1969 (NEPA),[95] Commission staff prepared a draft EIS for the proposed project, which was issued on May 13, 2022, and addressed all substantive environmental comments received prior to issuance.  The U.S. Environmental Protection Agency (EPA) participated as a cooperating agency in the preparation of the EIS.  The Commission issued a notice of availability of the draft EIS on May 13, 2022.  The notice was published in the *Federal Register* on May 19, 2022,[96] establishing July 5, 2022, as the deadline to file comments on the draft EIS and interventions.  As noted above, the American Gas Association filed a timely motion to intervene.  Commission staff conducted two public comment meetings on June 14 and June 16, 2022.

53.     In response to the draft EIS, we received seven oral comments during the public comment meetings and written comments were filed by the EPA, the U.S. Department of the Interior, Louisiana Department of Wildlife and Fisheries, Sierra Club, Center for Biological Diversity, Healthy Gulf, RESTORE,[97] and Turtle Island Restoration Network and many individuals.[98]  Comments expressed concerns regarding environmental justice communities, wetlands, sensitive species, climate change and greenhouse gas (GHG) emissions, and cumulative buildout impacts in the project area, and noted the economic opportunities the project would bring.

54.     Commission staff issued the final EIS on September 15, 2022.  The notice of the availability for the final EIS was published in the *Federal Register* on September 21, 2022.[99]  The final EIS addresses all substantive environmental comments received on the draft EIS and concludes that construction and operation of the project would result in limited adverse environmental impacts.  The final EIS addressed geology; soils; water resources; vegetation and wildlife (including special status species); land use, recreation, and visual resources; cultural resources; socioeconomics and environmental justice; air quality; noise; GHG and climate change; reliability and safety; environmental trends; and alternatives.  With the exception of climate change impacts, the final EIS concludes that impacts would be reduced to less-than-significant levels through implementation of

---

[95] 42 U.S.C. §§ 4321 *et seq.  See also* 18 C.F.R. pt. 380 (2022) (Commission's regulations implementing NEPA).

[96] 87 Fed. Reg. 30,475 (May 19, 2022).

[97] Sierra Club and RESTORE filed individual comments as well as joint comments.

[98] Sierra Club's comments include comments from 787 individuals.  *See* Sierra Club July 6, 2023 Comments at 2-86.

[99] 87 Fed. Reg. 57,694 (Sept. 21, 2022).

Commission staff's recommendations (which we have adopted herein as conditions) and Driftwood Pipeline's proposed avoidance, minimization, and mitigation measures. In response to the final EIS, the Commission received several comments of support for the project; comments from the Louisiana Department of Wildlife and Fisheries regarding the impact on Louisiana-designated Natural and Scenic Rivers, Saline Western Longleaf Pine Savannah, certain rare plants, and freshwater mussels;[100] and a letter from the EPA indicating that it is satisfied with the EIS and has no additional comments.[101]

## 1. Louisiana Department of Wildlife and Fisheries Comments

55.    The impacts to Louisiana-designated Natural and Scenic Rivers are thoroughly addressed in the final EIS[102] and indicate that the Line 200 and Line 300 Project would cross two Louisiana Natural and Scenic Rivers:  Hickory Branch at milepost 11.1 and Beckwith Creek at milepost 12.3.  Driftwood Pipeline proposes to cross these rivers by the horizontal directional drill method; therefore, no visual or recreational impacts are anticipated.  The impact on the Saline Western Longleaf Pine Savannah is also addressed in final EIS.[103]  The Louisiana Department of Wildlife and Fisheries indicated[104] it would include conservation measures for these habitats in the Scenic River Permits that would be issued for the Beckwith Creek and Hickory Branch Creek crossings.  Threatened and endangered plants and animals, including freshwater mussels, are thoroughly addressed within the final EIS.  Commission staff concluded Endangered Species Act consultation with the U.S. Fish and Wildlife Service on federally listed threatened and endangered species on July 25, 2022.[105]  For state-listed species, the Louisiana Department of Wildlife and Fisheries identified two rare plant species that may occur within the project area.  Neither of these species were observed during field surveys conducted by Driftwood Pipeline; however, surveys conducted to date have not been conducted during the optimal survey window for the species.  Therefore, Driftwood Pipeline has committed to conduct additional surveys in suitable habitat areas during the optimal survey window

---

[100] Louisiana Department of Wildlife and Fisheries October 5, 2022 Comments at 1.

[101] EPA October 24, 2022 Comments at 1.

[102] Final EIS at 4-151.

[103] *Id.* at 4-37 & 4-38.

[104] *Id.* at 4-38.

[105] *Id.* at 4-53.  Commission staff concluded, and the U.S. Fish and Wildlife Service concurred, that the project would not likely adversely affect the eastern black rail. *See* U.S. Fish and Wildlife Service's July 25, 2022 Letter (filed on Sept. 7, 2022).

for the species and will provide the survey results to the Louisiana Department of Wildlife and Fisheries and file the resulting consultation with the Commission.[106]

## 2.    Greenhouse Gas Emissions and Climate Change

56.    The Council on Environmental Quality (CEQ) defines effects or impacts as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable," which include those effects that "occur at the same time and place" and those that "are later in time or farther removed in distance, but are still reasonably foreseeable."[107]  An impact is reasonably foreseeable if it is "sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision."[108]

57.    For the Line 200 and Line 300 Project, we find that the construction emissions, operational emissions, and downstream combustion emissions associated with the transportation capacity subscribed by Entergy Louisiana, LLC are reasonably foreseeable emissions.[109]  The final EIS estimates that construction of the project may result in

---

[106] Final EIS at 4-58.

[107] 40 C.F.R. § 1508.1(g) (2022).

[108] 40 C.F.R. § 1508.1(aa).  *See Food & Water Watch v. FERC*, 28 F.4th 277, 288 (D.C. Cir. 2022) ("Foreseeability depends on information about the 'destination and end use of the gas in question.'") (citation omitted); *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (*Sabal Trail*) ("FERC should have estimated the amount of power-plant carbon emissions that the pipelines will make possible.").

[109] The downstream emissions resulting from the capacity subscribed by Driftwood LNG and Sequent Energy Management LLC are not reasonably foreseeable because, respectively, the record shows that these shippers' capacity will be used to export natural gas and does not have an identified end-use.  *See Columbia Gulf Transmission, LLC*, 178 FERC ¶ 61,198, at P 46, *order on reh'g*, 180 FERC ¶ 61,206, at P 78 (2022) (where it is known that the natural gas being transported by a proposed project is intended to be delivered to a LNG export terminal for liquefaction and ultimate, export to other countries, the Commission will not consider the upstream or downstream GHG emissions associated with the export of the natural gas transported by the project); *ANR Pipeline Co.*, 179 FERC 61,040, at PP 13, 45 (2022) (excluding from the calculation of reasonably foreseeable downstream emissions the emissions associated with capacity that would "supply other U.S. markets" along the pipeline system).  *See also* Driftwood Pipeline February 14, 2023 Data Response at 3-4 (stating that the capacity subscribed by Sequent Energy Management LLC will be delivered to the local Lake Charles market and could be sold to any end user; the capacity subscribed by Driftwood LNG will be used to

emissions of up to 90,470 metric tons of carbon dioxide equivalents ($CO_2e$) over the 4-year construction period.[110]  The final EIS estimates that operation of the project would result in 314,700 metric tons of $CO_2e$ per year, assuming the facilities are operated at maximum capacity for 365 days per year and 24 hours per day.[111]  The reasonably foreseeable downstream emissions from the project, assuming the subscribed capacity is transported 365 days per year and consumed domestically, would result in 1.93 million metric tons of $CO_2e$ per year.[112]

58.     As we have done in prior certificate orders, we compare estimated project GHG emissions to the total GHG emissions of the United States as a whole and at the state level.  This comparison allows us to contextualize the project emissions of the project.[113]  At a national level, 5,222.4 million metric tons of $CO_2e$ were emitted in 2020 (inclusive of $CO_2e$ sources and sinks).[114]  Construction emissions from the project could potentially increase $CO_2e$ emissions based on the national 2020 levels by 0.002%; in subsequent years, the operation and reasonably foreseeable downstream GHG emissions could potentially increase emissions by 0.04.0%.

59.     At the state level, we compare the project's GHG emissions to the Louisiana State fossil fuel inventory.  Energy related $CO_2$ emissions in Louisiana were 194.9 million

---

supply the Driftwood LNG terminal and/or be delivered to the interstate pipeline grid when not supplying the Driftwood LNG terminal).

[110] Final EIS at 4-125.

[111] *Id.* at 4-120-4-121.

[112] The final EIS calculated downstream numbers based on domestic consumption of the subscribed capacity because at the time the public record for this proceeding did not specify the amount of project throughput that may be destined for export overseas. *See* final EIS at 4-125.

[113] In the final EIS, the comparison to the national and state GHG inventories as well as to the state's targeted reduction goal and calculation of the social cost of GHGs (SC-GHGs) were based on domestic consumption of all of the subscribed capacity. Because we have determined that only the capacity subscribed to Entergy Louisiana, LLC will have reasonably foreseeable downstream GHG emissions, the following comparisons and calculation of the SC-GHGs only consider the project's emissions of the capacity subscribed to Entergy Louisiana, LLC.

[114] EPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2020 at ES-4 (Table ES-2) (April 2022), https://www.epa.gov/system/files/documents/2022-04/us-ghg-inventory-2022-main-text.pdf.

metric tons in 2019.[115]  Accordingly, construction emissions from the project could potentially increase $CO_2e$ emissions by 0.046%; in subsequent years, the project operations, including reasonably foreseeable subscribed downstream end use, could potentially increase emissions by 1.15%.

60.    When states have GHG emissions reduction targets, we will compare the project's GHG emissions to those state goals to provide additional context.  To evaluate the project's operational emissions in the context of Louisiana's GHG reduction goals, we compare the project's GHG emissions to Louisiana climate targets.  The state of Louisiana established executive targets in 2020 to reduce net GHG emissions 26 to 28% by 2025 and 40 to 50% by 2030, compared to 2005 levels.[116]  The targets also aim for net-zero GHG emissions by 2050.  Direct GHG emissions from the operation of the project and reasonably foreseeable downstream end use, if used within the state of Louisiana, would represent 1.54% of Louisiana's 2025 and 2.22% of Louisiana's 2030 projected GHG emission levels, assuming the reductions from 2005 levels summarized above.[117]

61.    For informational purposes, we are disclosing Commission staff's revised estimate of the social cost of GHGs associated with the reasonably foreseeable emissions from the Line 200 and Line 300 Project.[118]  While we have recognized in some past orders that social cost of GHGs may have utility in certain contexts such as rulemakings,[119] we have also found that calculating the social cost of GHGs does not enable the Commission to determine credibly whether the reasonably foreseeable GHG emissions associated with a project are significant or not significant in terms of their impact on global climate change.[120]  Currently, however, there are no criteria to identify what monetized values are

---

[115] Final EIS at 4-126.

[116] In 2005, Louisiana emitted 201.9 million metric tons of $CO_2e$.  U.S. Energy Information Administration, Table 1, State Energy-Related Carbon Dioxide Emissions by Year, Unadjusted. (April 13, 2022).

[117] We consider the 2025 GHG emission target to be 145.4 million metric tons (assuming a 28% reduction) and the 2030 target to be 100.95 million metric tons (assuming a 50% reduction).

[118] *See Id.* at 4-127 – 4-128 for a description of the method and assumptions staff used for calculating the SC-GHGs.

[119] *Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099, at PP 35-37 (2018).

[120] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P296, (2017), *aff'd sub nom.*, *Appalachian Voices v. FERC*, 2019 WL 847199 (D.C. Cir. 2019); *Del. Riverkeeper v. FERC*, 45 F.th 104, 111 (D.C. Cir. 2022).  The Social Cost of GHGs tool

significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria.[121]  Nor are we aware of any other currently scientifically accepted method that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions.[122]  The DC Circuit has repeatedly upheld the Commission's decisions not to use the SCC, including to assess significance.[123]

62.     For the calculations, staff assumed discount rates of 5%, 3%, and 2.5%, assumed the project will begin service in 2026 and that the project's operational emissions will be at a constant rate throughout a 20-year period, assumed to be the life of the project for purposes of the SC-GHG calculation.  Noting these assumptions, the reasonably foreseeable emissions from construction and operation of this project are calculated to result in a total social cost of GHGs equal to $629 million, $2.4 billion, and $3.6 billion,

merely converts GHG emissions estimates into a range of dollar-denominated figures; it does not, in itself, provide a mechanism or standard for judging "significance."

[121] *Tenn. Gas Pipeline Co., L.L.C.*, 181 FERC ¶ 61,051 at P 37; *see also Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 296, *order on reh'g*, 163 FERC ¶ 61,197, at PP 275-297 (2018), *aff'd*, *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at 2 (D.C. Cir. Feb. 19, 2019) (unpublished) ("[The Commission] gave several reasons why it believed petitioners' preferred metric, the Social Cost of Carbon tool, is not an appropriate measure of project-level climate change impacts and their significance under NEPA or the Natural Gas Act.  That is all that is required for NEPA purposes."); *EarthReports*, 828 F.3d 949, 956 (D.C. Cir. 2016) (accepting the Commission's explanation why the social cost of carbon tool would not be appropriate or informative for project-specific review, including because "there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes"); *Tenn. Gas Pipeline Co., L.L.C.*, 180 FERC ¶ 61,205, at P 75 (2022); *See, e.g., LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14 (2023); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206, at P 91 (2022).

[122] *See, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14 (2023) ("there are currently no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria.")

[123] *See, e.g.*, *EarthReports v. FERC*, 848 F.3d 949, 956 (D.C. Cir. 2016) (upholding the Commission's decision not to use the social cost of carbon tool due to a lack of standardized criteria or methodologies, among other things); *Del. Riverkeeper v. FERC*, 45 F.4th 104 (D.C. Cir. 2022) (also upholding the Commission's decision not to use the social cost of carbon); *Appalachian Voices v. FERC*, 2019 WL 847199 (D.C. Cir. 2019) (same).

respectively (all in 2020 dollars).[124]  Using the 95th percentile of the social cost of GHGs using the 3% discount rate,[125] the total social cost of GHGs from the project is calculated to be $7.2 billion (in 2020 dollars).

63.     The Commission has disclosed the project's reasonably foreseeable GHG emissions above.  By adopting the analysis in the EIS, we recognize that the project's contributions to GHG emissions globally contribute incrementally to future climate change impacts,[126] including impacts in the region.[127]  We note that there currently are no accepted tools or methods for the Commission to use to determine significance,[128] therefore the Commission is not herein characterizing these emissions as significant or insignificant.[129]  Accordingly, we have taken the required "hard look" and have satisfied our obligations under NEPA.

### 3.    Environmental Justice

64.     In conducting NEPA reviews of proposed natural gas projects, the Commission follows Executive Order 12898, which directs federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their

---

[124] The IWG draft guidance identifies costs in 2020 dollars.  Interagency Working Group on Social Cost of Greenhouse Gases, United States Government, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990*, at 5 (Table ES-1) (Feb. 2021).

[125] This value represents "higher-than-expected economic impacts from climate change further out in the tails of the [social cost of CO2] distribution."  *Id*. at 11.  In other words, it represents a higher impact scenario with a lower probability of occurring.

[126] Final EIS at 4-125.

[127] *Id*. at 4-127 (discussing observations from the Fourth Assessment Report).

[128] The February 18, 2022 Interim GHG Policy Statement, Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs., 178 FERC ¶ 61,108 (2022) which proposed to establish a NEPA significance threshold of 100,000 tons per year of $CO_2e$ as a matter of policy, has been suspended, and opened to further public comment.  Order on Draft Policy Statements, 178 FERC ¶ 61,197, at P 2 (2022).

[129] The February 18, 2022 Interim GHG Policy Statement, *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022) which proposed to establish a NEPA significance threshold of 100,000 tons per year of $CO_2e$ as a matter of policy, has been suspended, and opened to further public comment.  *Order on Draft Policy Statements*, 178 FERC ¶ 61,197, at P 2 (2022).

actions on minority and low-income populations (i.e., environmental justice communities).[130]  Executive Order 14008 also directs agencies to develop "programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."[131]  Environmental justice is "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies."[132]

---

[130] Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994).  While the Commission is not one of the specified agencies in Executive Order 12898, the Commission nonetheless addresses environmental justice in its analysis, in accordance with our governing regulations and guidance, and statutory duties.  *See* 15 U.S.C. § 717f; *see also* 18 C.F.R. § 380.12(g) (2022) (requiring applicants for projects involving significant aboveground facilities to submit information about the socioeconomic impact area of a project for the Commission's consideration during NEPA review); FERC, *Guidance Manual for Environmental Report Preparation* at 4-76 to 4-80 (Feb. 2017), https://www.ferc.gov/sites/default/files/2020-04/guidance-manual-volume-1.pdf.

[131] Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Feb. 1, 2021).  The term "environmental justice community" includes disadvantaged communities that have been historically marginalized and overburdened by pollution.  *Id.* at 7629.  The term also includes, but may not be limited to minority populations, low-income populations, or indigenous peoples.  *See* EPA, EJ 2020 Glossary (Aug. 18, 2022), https://www.epa.gov/environmentaljustice/ej-2020-glossary.

[132] EPA, *Learn About Environmental Justice* (Sept. 6, 2022) https://www.epa.gov/environmentaljustice/learn-about-environmental-justice.  Fair treatment means that no group of people should bear a disproportionate share of the negative environmental consequences resulting from industrial, governmental, and commercial operations or policies.  *Id.*  Meaningful involvement of potentially affected environmental justice community residents means:  (1) people have an appropriate opportunity to participate in decisions about a proposed activity that may affect their environment and/or health; (2) the public's contributions can influence the regulatory agency's decision; (3) community concerns will be considered in the decision-making process; and (4) decision-makers will seek out and facilitate the involvement of those potentially affected.  *Id.*

65.    Consistent with CEQ[133] and EPA[134] guidance and recommendations, the Commission's methodology for assessing environmental justice impacts considers: (1) whether environmental justice communities (e.g., minority or low-income populations)[135] exist in the project area; (2) whether impacts on environmental justice communities are disproportionately high and adverse; and (3) possible mitigation measures.  As recommended in *Promising Practices*, the Commission uses the 50% and the meaningfully greater analysis methods to identify minority populations.[136] Specifically, a minority population is present where either:  (1) the aggregate minority population of the block groups in the affected area exceeds 50%; or (2) the aggregate minority population in the block group affected is 10% higher than the aggregate minority population percentage in the county.[137]

---

[133] CEQ, *Environmental Justice:  Guidance Under the National Environmental Policy Act* 4 (Dec. 1997) (CEQ's *Environmental Justice Guidance*), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf.  CEQ offers recommendations on how federal agencies can provide opportunities for effective community participation in the NEPA process, including identifying potential effects and mitigation measures in consultation with affected communities and improving the accessibility of public meetings, crucial documents, and notices.  Commission staff held multiple virtual public meetings designed to inform the public about the project and provide the public the opportunity to ask questions and discuss issues and concerns about the project.  *See* final EIS at 4-90.  There were opportunities for public involvement for environmental justice communities during the Commission's environmental review processes and were targeted at engaging environmental justice communities.

[134] *See generally* EPA's Federal Interagency Working Group for Environmental Justice and NEPA's Committee, *Promising Practices for EJ Methodologies in NEPA Reviews* (Mar. 2016) (*Promising Practices*) https://www.epa.gov/sites/default/files/2016-08/documents/nepa_promising_practices_document_2016.pdf.

[135] *See generally* Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994). Minority populations are those groups that include:  American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic.

[136] *See Promising Practices* at 21-25.

[137] Final EIS at 4-92.  Here, Commission staff selected each Parish as the reference community to ensure that affected environmental justice communities are properly identified.  Because the proposed activities are located in Beauregard and Calcasieu Parishes, Louisiana, and impacts on environmental justice communities could occur in each parish, the parish is the appropriate reference community for the block group.

66.     CEQ's *Environmental Justice Guidance* also directs low-income populations to be identified based on the annual statistical poverty thresholds from the U.S. Census Bureau. Using *Promising Practices*' low-income threshold criteria method, low-income populations are identified as block groups where the percent of a low-income population in the identified block group is equal to or greater than that of the county.

67.     To identity potential environmental justice communities during preparation of the EIS, Commission staff used 2019 U.S. Census American Community Survey data[138] for the race, ethnicity, and poverty data at the state, county, and block group level.[139] Additionally, in accordance with *Promising Practices*, staff used EJScreen, EPA's environmental justice mapping and screening tool, as an initial step to gather information regarding minority and low-income populations; potential environmental quality issues; environmental and demographic indicators; and other important factors.

68.     Once staff collected the block group level data, as discussed in further detail below, staff conducted an impacts analysis for the identified environmental justice communities and evaluated health or environmental hazards, the natural physical environment, and associated social, economic, and cultural factors to determine whether impacts were disproportionately high and adverse on environmental justice communities and also whether those impacts were significant.[140]  Commission staff assessed whether impacts to an environmental justice community were disproportionately high and adverse based on whether those impacts were predominately borne by that community, consistent with EPA's recommendations in *Promising Practices*.[141]  Identified project impacts and Driftwood Pipeline's proposed mitigation measures are discussed below.

---

[138] U.S. Census Bureau, American Community Survey 2019 ACS 5-Year Estimates Detailed Tables, File# B17017, *Poverty Status in the Past 12 Months by Household Type by Age of Householder*, https://data.census.gov/cedsci/table?q=B17017; File #B03002 *Hispanic or Latino Origin By Race*, https://data.census.gov/cedsci/table?q=b03002.

[139] Final EIS at 4-92.

[140] *See Promising Practices* at 33 (stating that "an agency may determine that impacts are disproportionately high and adverse, but not significant within the meaning of NEPA" and in other circumstances "an agency may determine that an impact is both disproportionately high and adverse and significant within the meaning of NEPA").

[141] *Id.* at 44-46 (explaining that there are various approaches to determining whether an action will cause a disproportionately high and adverse impact, and that one recommended approach is to consider whether an impact would be "predominantly borne by minority populations or low-income populations").  We recognize that EPA and CEQ

69.    The proposed project will have a range of impacts on the environment and on individuals living in the vicinity of the project facilities, including environmental justice populations that were identified in the project area.  Line 200 and Line 300 will cross three environmental justice communities that were identified based on the low-income threshold.  The Indian Bayou Compressor Station is not located within an environmental justice community; however, 17 of the 44 block groups within a 20-kilometer radius of the compressor station are considered environmental justice communities based on low-income and/or minority thresholds.  The closest environmental justice block group of the identified 17 block groups is 4.75 miles from the compressor station.[142]  Meter station 7 will be located in an environmental justice community, based on the low-income threshold, and the closest residence is approximately 1,000 feet away.[143]  Meter station 9 will also be located in an environmental justice community, based on the low-income threshold, and the closest residence is about 585 feet away.[144]

70.    Project impacts on environmental justice populations may include impacts on socioeconomic factors.  Constructing the project will require about 1,050 non-local workers at peak, increasing the population of the entire project area by about 0.01%.[145]  The temporary influx of workers into the environmental justice communities could increase the demand for community services, such as housing, police enforcement, and medical care.  An influx of workers could also affect economic conditions and other community infrastructure including local roadways due to the movement of construction personnel, equipment, and materials.  Due to the anticipated small size of the construction workforce in the project area compared to the existing population, impacts on population, employment, and community services during the two-phase construction period of the project is expected to be short-term and minor, and long-term impacts during operation of the project are expected to be negligible.  Driftwood Pipeline will also employ various mitigation measures to minimize impacts on increased local traffic due to the increase in population.  The project will result in beneficial economic effects on local economies through payroll expenditures, local purchases of consumables and project-specific materials, and sales tax.  Overall, based on the temporary changes in population levels, employment opportunities, increased demand for housing and public services, tourism

---

are in the process of updating their guidance regarding environmental justice and we will review and incorporate that anticipated guidance in our future analysis, as appropriate.

[142] Final EIS at 5-12.

[143] *Id.*

[144] *Id.*

[145] *Id.*

and transportation impacts, the final EIS concludes that socioeconomic impacts on environmental justice communities would be less than significant.[146]  We agree.

71.    Temporary visual impacts will occur during the two-phase construction period of the pipelines and aboveground facilities, including vehicle and equipment movement, vegetation clearing and grading, trench and foundation excavation, pipe storage, and spoil piles.  Permanent visual impacts may occur along the pipelines' rights-of-way from periodic vegetation clearing to allow for visual pipeline inspection.

72.    As to aboveground facilities, the Indian Bayou Compressor Station is 4.75 miles from the nearest environmental justice block group; therefore, no adverse visual impacts are anticipated.  Meter station 7 will be constructed in a wooded lot surrounded by other wooded lots and, due to the existing tree cover in the vicinity of the proposed meter station, it will not be visible to any surrounding visual receptors including the closest residence.  Therefore, visual impacts will not occur due to the construction of meter station 7.  Meter station 9 will be constructed in an existing pasture used for cattle grazing and is adjacent to existing underground and overhead utility line rights-of-way to the northwest, west, and south.  To mitigate visual impacts, Driftwood Pipeline will install a 6-foot-tall chain-link fence around meter station 9 that will include appropriately colored lattice to match the background.[147]  Additionally, a vegetative buffer comprised of native shrubs and trees will be planted around the perimeter of the meter station property.[148]  Driftwood Pipeline will install on demand downward facing directional lighting at meter station 9 to allow for operational activities to take place occasionally at night.  With Driftwood Pipeline's proposed visual screening at meter station 9, the final EIS concludes that impacts on nearby residences and environmental justice communities would be less than significant.[149]  We agree.

73.    With respect to air emissions from construction, exhaust emissions and fugitive dust will result in short-term, localized impacts in the immediate vicinity of construction work areas.  Efforts to mitigate exhaust emissions during construction will include using construction equipment and vehicles that comply with EPA mobile and non-road emission regulations, and using commercial gasoline and diesel fuel products that meet specifications of applicable federal and state air pollution control regulations.  Driftwood Pipeline will implement a Fugitive Dust Control Plan to control construction-related dust in compliance with state regulations and Commission requirements.  Based on the

---

[146] *Id.*

[147] *Id.* at 5-13.

[148] *Id.*

[149] *Id.*

modeling results and the mitigation measures proposed by Driftwood Pipeline, the final EIS concludes that operation of the Indian Bayou Compressor Station would not cause or significantly contribute to a violation of any National Ambient Air Quality Standards (NAAQS) and emissions from meter station 7 and meter station 9 would be limited to fugitive releases and are not expected to cause or contribute to an exceedance of the NAAQS.  Accordingly, the final EIS concludes, and we agree, that overall, the construction and operational emissions from the project will not have significant adverse air quality impacts on the environmental justice populations in the project area.[150]

74.    Regarding noise impacts, construction noise related to project activities will be temporary.  Based on the Indian Bayou Compressor Station's distance from the nearest environmental justice community, the final EIS concludes that no adverse noise impacts from the station on the environmental justice community are anticipated.[151]  Operation of meter station 7 and meter station 9, with noise mitigation, will result in an increase in noise levels over ambient by 0.1 decibels.  The increase will be below or at the human ear's threshold of perception and below the applicable Commission criterion at the closest noise sensitive areas.[152]  Therefore, the final EIS concludes, and we agree that the project will not result in significant noise impacts on local residents and the surrounding communities, including environmental justice communities.

75.    Based on staff's analysis in the final EIS, environmental justice communities in the study area would experience cumulative impacts on visual resources, socioeconomics, traffic, noise, and air quality.[153]  However, the final EIS concludes, and we agree, that cumulative impacts on environmental justice communities related to visual resources, socioeconomics, traffic, noise, and air quality would be less than significant.[154]

76.    As described in the final EIS, the proposed project will have a range of impacts on the environment and individuals living in the vicinity of the project, including environmental justice populations.  For Line 200 and Line 300, as well as the Indian Bayou Compressor Station, the impacts will not be disproportionately high and adverse as they would not be predominately borne by environmental justice communities.  However, impacts from the construction and operation of meter station 7 and meter station 9 would be disproportionately high and adverse as they would be predominately

---

[150] Id.

[151] Id.

[152] Id.  See 18 C.F.R. § 380.12(k)(4)(v)(A) (2022).

[153] Id. at 4-155.

[154] Id.

borne by environmental justice communities; but, as described above, those impacts would be less than significant.[155]

### 4.    Environmental Analysis Conclusion

77.    We have reviewed the information and analysis contained in the final EIS regarding potential environmental effects of the Line 200 and Line 300 Project, as well as the other information in the record.  We are accepting the environmental recommendations in the final EIS and are including them as conditions in the Appendix to this order.  Based on our consideration of this information and the discussion above, we agree with the conclusions presented in the final EIS and find that the Line 200 and Line 300 Project is an environmentally acceptable action.

## IV.    Conclusion

78.    The proposed project will enable Driftwood Pipeline to enhance supply access to the natural gas market in the Lake Charles, Louisiana region.  We find that Driftwood Pipeline has demonstrated a need for the Line 200 and Line 300 Project, that the project will not have adverse economic impacts on existing shippers or other pipelines and their existing customers, and that the project will have minimal impacts on the interests of landowners and surrounding communities.  Additionally, as noted above, the project is an environmentally acceptable action.  Based on the discussion above, we find under section 7 of the NGA that the public convenience and necessity requires approval of Driftwood Pipeline's Line 200 and Line 300 Project, subject to the conditions in this order.

79.    Compliance with the environmental conditions appended in our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analyses.  Thus, Commission staff carefully reviews all information submitted.  Only when staff is satisfied that the applicant has complied with all applicable conditions will a notice to proceed with the activity to which the conditions are relevant be issued.  We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

80.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate.  The Commission encourages cooperation between interstate pipelines and local authorities.  However, this does not mean that state and local agencies, through application of state or

---

[155] *Id.* at 4-113.

local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[156]

81.    At a hearing held on April 20, 2023, the Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application, and exhibits thereto, and all comments, and upon consideration of the record,

The Commission orders:

(A)    A certificate of public convenience and necessity is issued to Driftwood Pipeline, authorizing it to construct and operate the proposed Line 200 and Line 300 Project, as described and conditioned herein, and as more fully described in the application and subsequent filings by the applicant, including any commitments made therein.

(B)    The certificate issued in Ordering Paragraph (A) is conditioned on Driftwood Pipeline's:

(1)    completing construction of the proposed facilities and making them available for service within two years of the date of this order pursuant to section 157.20(b) of the Commission's regulations;

(2)    compliance with all applicable Commission regulations under the NGA including, but not limited to, Parts 154, 157, and 284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations; and

(3)    compliance with the environmental conditions listed in the appendix to this order.

(C)    Driftwood Pipeline shall file a written statement affirming that it has executed firm contracts for the capacity levels and terms of service represented in its filed precedent agreements, prior to commencing construction.

---

[156] *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted) and *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal regulation, or would delay the construction and operation of facilities approved by the Commission).

Docket No. CP21-465-000, et al.                                           - 38 -

(D)     Driftwood Pipeline's proposed initial recourse reservation charges and interruptible rates are approved as the initial recourse charges and rates for each operational phase of the project subject to Driftwood Pipeline revising its rates to reflect the Commission's policy on ROE as discussed herein.

(E)     Driftwood Pipeline's proposed fuel rates are rejected.

(F)     Driftwood Pipeline is required to file actual tariff records reflecting revised initial rates and tariff language that comply with the requirements contained in the body of this order prior to the commencement of interstate service consistent with Part 154 of the Commission's regulations.

(G)     Driftwood Pipeline shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Driftwood Pipeline. Driftwood Pipeline shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

By the Commission.  Commissioner Clements is dissenting in part with a separate statement attached.

( S E A L )

Debbie-Anne A. Reese,
Deputy Secretary.

Docket No. CP21-465-000, et al.                                                    - 39 -

## Appendix

## Environmental Conditions

As recommended in the final Environmental Impact Statement (EIS), and otherwise amended herein, this authorization includes the following conditions:

1.    Driftwood Pipeline shall follow the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests) and as identified in the EIS, and this Order. Driftwood Pipeline must:

   a.    request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);

   b.    justify each modification relative to site-specific conditions;

   c.    explain how that modification provides an equal or greater level of environmental protection than the original measure; and

   d.    receive approval in writing from the Director of the Office of Energy Projects (Director of OEP), or the Director's designee, **before using that modification**.

2.    The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the Line 200 and Line 300 Project (Project).  This authority shall allow:

   a.    the modification of conditions of this Order;

   b.    stop-work authority; and

   c.    the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from Project construction and operation.

3.    **Prior to any construction**, Driftwood Pipeline shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors (EIs), and contractor personnel will be informed of the EI's authority and have been or will be trained on the

implementation of the environmental mitigation measures appropriate to their jobs **before** becoming involved with construction and restoration activities.

4.    The authorized facility locations shall be as shown in the EIS, as supplemented by filed alignment sheets.  **As soon as they are available, and before the start of construction**, Driftwood Pipeline shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the Order.  All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

Driftwood Pipeline's exercise of eminent domain authority granted under Natural Gas Act section 7(h) in any condemnation proceedings related to the Order must be consistent with these authorized facilities and locations.  Driftwood Pipeline's right of eminent domain granted under Natural Gas Act section 7(h) does not authorize it to increase the size of its natural gas facilities to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.    Driftwood Pipeline shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary.  Approval for each of these areas must be explicitly requested in writing.  For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area.  All areas shall be clearly identified on the maps/sheets/aerial photographs.  Each area must be approved in writing by the Director of OEP, or the Director's designee, **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* and/or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

a.    implementation of cultural resources mitigation measures;

Docket No. CP21-465-000, et al.                                          - 41 -

   b.   implementation of endangered, threatened, or special concern species
        mitigation measures;

   c.   recommendations by state regulatory authorities; and

   d.   agreements with individual landowners that affect other landowners or
        could affect sensitive environmental areas.

6.   **Within 60 days of the acceptance of the authorization and before construction
     begins**, Driftwood Pipeline shall file an Implementation Plan with the Secretary
     for review and written approval by the Director of OEP, or the Director's
     designee.  Driftwood Pipeline must file revisions to the plan as schedules change.
     The plan shall identify:

   a.   how Driftwood Pipeline will implement the construction procedures and
        mitigation measures described in its application and supplements (including
        responses to staff data requests), identified in the EIS, and required by the
        Order;

   b.   how Driftwood Pipeline will incorporate these requirements into the
        contract bid documents, construction contracts (especially penalty clauses
        and specifications), and construction drawings so that the mitigation
        required at each site is clear to onsite construction and inspection
        personnel;

   c.   the number of EIs assigned per spread, and how the company will ensure
        that sufficient personnel are available to implement the environmental
        mitigation;

   d.   company personnel, including EIs and contractors, who will receive copies
        of the appropriate material;

   e.   the location and dates of the environmental compliance training and
        instructions Driftwood Pipeline will give to all personnel involved with
        construction and restoration (initial and refresher training as the Project
        progresses and personnel change), with the opportunity for OEP staff to
        participate in the training session(s);

   f.   the company personnel (if known) and specific portion of Driftwood
        Pipeline's organization having responsibility for compliance;

   g.   the procedures (including use of contract penalties) Driftwood Pipeline will
        follow if

   h.   noncompliance occurs; and

Docket No. CP21-465-000, et al.                                      - 42 -

    i.     for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

        i.     the completion of all required surveys and reports;

        ii.     the environmental compliance training of onsite personnel;

        iii.     the start of construction; and

        iv.     the start and completion of restoration.

7.     Driftwood Pipeline shall employ at least one EI per construction spread.  The EI shall be:

    a.     responsible for monitoring and ensuring compliance with all mitigation measures required by the Order and other grants, permits, certificates, or other authorizing documents;

    b.     responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

    c.     empowered to order correction of acts that violate the environmental conditions of this Order, and any other authorizing document;

    d.     a full-time position, separate from all other activity inspectors;

    e.     responsible for documenting compliance with the environmental conditions of the Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

    f.     responsible for maintaining status reports.

8.     Beginning with the filing of its Implementation Plan, Driftwood Pipeline shall file updated status reports with the Secretary on **a biweekly** basis until all construction and restoration activities are complete.  On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

    a.     an update on Driftwood Pipeline's efforts to obtain the necessary federal authorizations;

    b.     the construction status of each spread, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally-sensitive areas;

Docket No. CP21-465-000, et al.                                                  - 43 -

    c.      a listing of all problems encountered and each instance of noncompliance observed by the EIs during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

    d.      a description of the corrective actions implemented in response to all instances of noncompliance;

    e.      the effectiveness of all corrective actions implemented;

    f.      a description of any landowner/resident complaints which may relate to compliance with the requirements of the Order, and the measures taken to satisfy their concerns; and

    g.      copies of any correspondence received by Driftwood Pipeline from other federal, state, or local permitting agencies concerning instances of noncompliance, and Driftwood Pipeline's response.

9.    Driftwood Pipeline shall develop and implement an environmental complaint resolution procedure, and file such procedure with the Secretary, for review and approval by the Director of OEP, or the Director's designee.  The procedure shall provide landowners with clear and simple directions for identifying and resolving their environmental mitigation problems/concerns during construction of the Project and restoration of the right-of-way.  **Prior to construction**, Driftwood Pipeline shall mail the complaint procedures to each landowner whose property will be crossed by the Project.

    a.      In its letter to affected landowners, Driftwood Pipeline shall:

        i.      provide a local contact that the landowners should call first with their concerns; the letter should indicate how soon a landowner should expect a response;

        ii.      instruct the landowners that if they are not satisfied with the response, they should call Driftwood Pipeline's Hotline; the letter should indicate how soon to expect a response; and

        iii.     instruct the landowners that if they are still not satisfied with the response from Driftwood Pipeline's Hotline, they should contact the Commission's Landowner Helpline at 877-337-2237 or at LandownerHelp@ferc.gov.

    b.      In addition, Driftwood Pipeline shall include in its **biweekly** status report a copy of a table that contains the following information for each problem/concern:

Docket No. CP21-465-000, et al.                                                                    - 44 -

    i.    the identity of the caller and date of the call;

    ii.    the location by milepost and identification number from the authorized alignment sheet(s) of the affected property;

    iii.    a description of the problem/concern; and

    iv.    an explanation of how and when the problem was resolved, will be resolved, or why it has not been resolved.

10. Driftwood Pipeline must receive written authorization from the Director of OEP, or the Director's designee, **before commencing construction of any Project facilities**.  To obtain such authorization, Driftwood Pipeline must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

11. Driftwood Pipeline must receive written authorization from the Director of OEP, or the Director's designee, **before placing the Project into service**.  Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the Project are proceeding satisfactorily.

12. **Within 30 days of placing the authorized facilities in service**, Driftwood Pipeline shall file an affirmative statement with the Secretary, certified by a senior company official:

    a.    that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

    b.    identifying which of the conditions in the Order Driftwood Pipeline has complied with or will comply with.  This statement shall also identify any areas affected by the Project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

13. All conditions attached to the water quality certification issued by the Louisiana Department of Environmental Quality, except those that the Director of OEP, or the Director's designee, identify as waived pursuant to 40 C.F.R. § 121.9, constitute mandatory conditions of this Certificate Order.  **Prior to construction**, Driftwood shall file, for review and written approval of the Director of OEP, or the Director's designee, any revisions to its project design necessary to comply with the water quality certification conditions.

14.    Driftwood Pipeline shall **not begin** construction of facilities and/or use of all staging, storage, or temporary work areas and new or to-be-improved access roads **until**:

    a.    Driftwood Pipeline files with the Secretary a survey report for Project areas not previously surveyed, and any remaining cultural resources survey report(s), site evaluation report(s) and avoidance/treatment plan(s), as required, and comments on the cultural resources reports and plans from the Louisiana State Historic Preservation Officer;

    b.    the Advisory Council on Historic Preservation is afforded an opportunity to comment if historic properties would be adversely affected; and

    c.    FERC staff reviews and the Director of OEP, or the Director's designee, approves the cultural resources reports and plans, and notifies Driftwood Pipeline in writing that treatment plans/mitigation measures may be implemented and/or construction may proceed.

All materials filed with the Commission containing location, character, and ownership information about cultural resources must have the cover and any relevant pages therein clearly labeled in bold lettering: **"CUI//PRIV- DO NOT RELEASE."**

15.    **Prior to construction**, Driftwood Pipeline shall file a noise analysis with the Secretary to identify the estimated operational noise levels from Meter Stations 1, 2, 4 and 11 on all nearby noise sensitive areas (NSAs).

16.    Driftwood Pipeline shall file a noise survey with the Secretary **no later than 60 days** after placing each of the new aboveground facilities (Indian Bayou Compressor Station and meter stations 1, 2, 3, 4, 5, 7, 9, 11, 12, 13, and 14) in service.  If a full-load condition noise survey is not possible, Driftwood Pipeline shall provide an interim survey at the maximum possible horsepower load for the compressor station and maximum flow for the meter stations and provide the full load survey **within 6 months**.  If the noise attributable to the operation of all of the equipment at the Indian Bayou Compressor Station and meter stations 1, 2, 3, 4, 5, 7, 9, 11, 12, 13, and 14 under interim or full horsepower load or maximum flow conditions exceeds an day-night sound level of 55 decibels on the A-weighted scale at any nearby NSAs, Driftwood Pipeline shall file a report on what changes are needed and should install the additional noise controls to meet the level **within 1 year** of the in-service date.  Driftwood Pipeline shall confirm compliance with the above requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Driftwood Pipeline LLC                          Docket Nos.  CP21-465-000
                                                             CP21-465-001
                                                             CP21-465-002

(Issued April 21, 2023)

CLEMENTS, Commissioner, *dissenting in part*:

1.      I concur with the result of today's Order, but dissent from its discussion regarding the Commission's ability to assess the significance of the impacts of greenhouse gas (GHG) emissions.[1]

2.      Paragraphs 61 and 63 of the Order could be interpreted as the Commission's definitive conclusion that the Social Cost of GHGs protocol is inherently unsuitable for determining the significance of GHG emissions associated with natural gas infrastructure projects.  Moreover, the Order suggests that there is no other "currently scientifically accepted method that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions."[2]  In other recent certificate orders, the Commission has explained that it is not determining the significance of GHG emissions because the issue of how to do so is under consideration in the docket for the Commission's draft GHG Policy Statement.[3]  This Order does not say that.  Readers might therefore wonder whether this Order has effectively decided some of the central issues raised in the GHG Policy Statement docket.[4]

3.      I do not know whether the Social Cost of GHGs protocol or another tool can or should be used to determine significance.  That is because the Commission has not seriously studied the answer to that question.  Rather, the majority has simply decided the method does not work, with no explanation of why the Commission departs from the

---

[1] *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at PP 61, 63 (2023) (Order).

[2] *Id.* at P 61.

[3] *See, e.g.*, *Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,006, at P 73 & n.174 (2023); *Columbia Gas Transmission, LLC,* 182 FERC ¶ 61,171, at P 46 & n.93 (2023).

[4] *See* Docket No. PL21-3.

approach so recently taken in other certificate orders.[5]  We have yet to address the voluminous record in the GHG Policy Statement docket, including comments that speak to this question.  What I do know is that we should decide the important unresolved issues relating to our assessment of GHG emissions through careful deliberation in a generic proceeding with full transparency.

_____

Allison Clements
Commissioner

_____

**[5]** To depart from prior precedent without explanation violates the Administrative Procedure Act.  *See, e.g.*, *West Deptford Energy, LLC v. FERC*, 766 F.3d 10, 17 (D.C. Cir. 2014) ("[T]he Commission cannot depart from [prior] rulings without providing a reasoned analysis.") (citations omitted).

# Exhibit B

183 FERC ¶ 62,153
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Driftwood Pipeline LLC                                    Docket No. CP21-465-003

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(June 22, 2023)

Rehearing has been timely requested of the Commission's order issued on
April 21, 2023, in this proceeding. *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 (2023).
In the absence of Commission action on a request for rehearing within 30 days from the
date it is filed, the request for rehearing may be deemed to have been denied.  15 U.S.C.
§ 717r(a); 18 C.F.R. § 385.713 (2022); *Allegheny Def. Project v. FERC*, 964 F.3d 1
(D.C. Cir. 2020) (en banc).

As provided in 15 U.S.C. § 717r(a), the request for rehearing of the above-cited
order filed in this proceeding will be addressed in a future order to be issued consistent
with the requirements of such section.  As also provided in 15 U.S.C. § 717r(a), the
Commission may modify or set aside its above-cited order, in whole or in part, in such
manner as it shall deem proper.

Kimberly D. Bose,
Secretary.