ORAL ARGUMENT NOT YET SCHEDULED

No. 23-1226

**UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

HEALTHY GULF, *et al.*,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent,*

DRIFTWOOD PIPELINE, LLC*,*

*Respondent-Intervenor.*

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

**PETITIONERS' JOINT
FINAL OPENING BRIEF**

David Bookbinder
Law Offices of David Bookbinder
107 S. West Street, Suite 491
Alexandria, VA 22314
(301) 751-0611
david.bookbinder@verizon.net

*Attorney for Healthy Gulf and Sierra Club*

Dated April 10, 2024

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

**A.      Parties**

1.      Petitioners in 23-1226:

Sierra Club

Healthy Gulf

Sierra Club and Healthy Gulf have no parent companies, and there are no publicly

held companies that have a 10 percent or greater ownership interest in either.

Sierra Club is a nonprofit corporation organized and existing under the laws of the

State of California, dedicated to the protection and enjoyment of the environment.

Healthy Gulf is a nonprofit corporation organized and existing under the laws of

the State Louisiana, dedicated to collaborating and serving with communities who

love the Gulf of Mexico by providing the research, communications, and coalition-

building tools needed to reverse the long pattern of over exploitation of the Gulf's

natural resources.

2.      Respondent

Federal Energy Regulatory Commission

3.      Respondent-Intervenors

Driftwood Pipeline, LLC

Driftwood LNG, LLC

**B.     Ruling Under Review**

1.     Order Issuing Certificate, *Driftwood Pipeline LLC*, FERC Docket No.
CP21-465 (April 21, 2023), FERC Accession No. 20230421-3050.

**C.     Statement of Related Cases**

The undersigned states that as of the date of this filing, one other case
pending before this court is related to this case and contains some, but not
all, of the same or similar issues within the meaning of Circuit Rule
28(a)(1)(C):

1.     *Alabama Municipal Distributors Group, et al., v. Federal Energy
Regulatory Commission,* No. 22-1101 (L), **argued Sept. 5, 2023**,
(concerning the Tennessee Gas Pipeline Company Order Issuing
Certificates and Approving Abandonment for the Evangeline Pass
pipeline project).

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ....... i

TABLE OF AUTHORITIES ...........................................................................v

GLOSSARY ...................................................................................................ix

JURISDICTIONAL STATEMENT ..............................................................1

ISSUES FOR REVIEW ................................................................................2

STATUTES AND REGULATIONS .............................................................3

STATEMENT OF THE CASE .....................................................................4

   I.   INTRODUCTION ..............................................................................4

   II.   LEGAL FRAMEWORK ....................................................................8

      A.   Natural Gas Act ..........................................................................8

      B.   National Environmental Policy Act ("NEPA") .........................9

   III.   FACTUAL BACKGROUND ...........................................................11

      A.   The Driftwood Project...............................................................11

      B.   Lines 200-300 ...........................................................................13

      C. The 200-300 Certificate ...............................................................16

         i.   Upstream Greenhouse Gas Emissions .................................21

         ii.  Construction and Operations Emissions .............................21

         iii. Downstream emissions.......................................................23

SUMMARY OF ARGUMENT .....................................................................24

STANDING...................................................................................................29

ARGUMENT .................................................................................................33

   I.   STANDARD OF REVIEW ...............................................................33

**II.  THERE IS NO NEED FOR LINES 200-300 THAT JUSTIFIES A SECTION 7 CERTIFICATE.** ....................................................**33**

**III.  FERC VIOLATED NEPA BY NOT ANALYZING LINES 200-300 AND THE DRIFTWOOD LNG TERMINAL AS A SINGLE PROJECT.** ..................................................................**39**

**IV.  FERC REFUSED TO PROPERLY CONSIDER DIRECT AND INDIRECT PIPELINE GREENHOUSE GAS EMISSIONS AND AS A RESULT VIOLATED THE NATURAL GAS ACT BY NOT INCLUDING THE IMPACTS OF THESE EMISSIONS IN ITS SECTION 7 DETERMINATION.** ...........................................**44**

   A.  FERC Arbitrarily Refused to Determine the Upstream Emissions Attributable to Lines 200-300. ...............................................**44**

   B.  FERC Arbitrarily Refused to Characterize the Significance of Any Part of 200-300's Greenhouse Gas Emissions and Failed to Consider Them in Making Its Section 7 Determination. .......................................**48**

**V.  REMEDY** ...............................................................................**56**

**CONCLUSION** ..............................................................................**58**

**CERTIFICATE OF COMPLIANCE** .................................................**59**

**CERTIFICATE OF SERVICE** .........................................................**60**

## TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993)................................................................56

*Balt. Gas & Elec. Co. v. NRDC,*
  462 U.S. 87 (1983)...................................................................................9

*Birckhead v. FERC,*
  925 F.3d 510 (D.C. Cir. 2019)...................................................... 46, 47

*City of Bos. Delegation v. FERC,*
  897 F.3d 241 (D.C. Cir. 2018)..............................................................42

*City of Oberlin v. FERC,*
  937 F.3d 599 (D.C. Cir. 2019).......................................................9, 55

*Del. Riverkeeper Network v. FERC,*
  753 F.3d 1304 (D.C. Cir. 2014)..................................... 10, 26, 33, 41, 42, 43, 44

*Eagle County v. Surface Transp. Bd.,*
  82 F.4th 1152 (D.C. Cir. 2023)..............................................................45

*Environmental Defense Fund v. FERC,*
  2 F.4th 953 (D.C. Cir. 2021)................................................... 37, 38, 39

*Friends of the Earth, Inc. v. Laidlaw Env't Servs.,*
  528 U.S. 167 (2000)................................................................................32

*Mont. Wilderness Ass'n v. McAllister,*
  666 F.3d 549 (9th Cir. 2011) ...............................................................50

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)..................................................................................33

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989)................................................................................48

*Sierra Club v. FERC*,
  827 F.3d 36 (D.C. Cir. 2016) ................................................................47

*Sierra Club v. FERC,*
  867 F.3d 1357 (D.C. Cir. 2017) ................................................... 44, 49

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ..............................................................................32

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  985 F.3d 1032 (D.C. Cir. 2021) .................................................... 56, 57

*Taxpayers Watchdog v. Stanley,*
  819 F.2d 294 (D.C. Cir. 1987) .............................................................42

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
  6 F.4th 1321 (D.C. Cir. 2021) .............................................. 7, 8, 28, 51

**Statutes**

5 U.S.C. 706(2) .........................................................................................56

15 U.S.C. 717f(c) ...................................................................................1, 8

15 U.S.C. 717r(a) ......................................................................................1

42 U.S.C. 4332(C) .....................................................................................9

**Regulations**

18 C.F.R. 157.14 ...................................................................................2, 46

18 C.F.R. 380.6 ..........................................................................................9

18 C.F.R. 380.7 ................................................................................. 10, 49

18 C.F.R. 385.214. .....................................................................................1

40 C.F.R. 1501.9 ............................................................................ 5, 10, 26

40 C.F.R. 1502.14 .....................................................................................48

40 C.F.R. 1502.16 ............................................................................... 10, 48

40 C.F.R. 1502.21 ...................................................................... 8, 28, 50, 51

40 C.F.R. 1508.1 ..................................................................................9, 10

**FERC Orders**

*Cameron LNG, LLC,*
    147 FERC ¶ 61,230 (June 19, 2014)............................................. 19, 36

*Commonwealth LNG, LLC,*
    181 FERC ¶ 61,143 (Nov. 17, 2022) ........................................... 19, 36

*Driftwood LNG LLC,*
    167 FERC ¶ 61,054 (Apr. 18, 2019)....................... 12, 13, 16, 17, 18, 40

*Driftwood Pipeline LLC,*
    183 FERC ¶ 61,049 (Apr. 21, 2023)... 1, 14, 16, 17, 19, 21, 22, 23, 24, 27, 34, 36, 38, 39, 40, 45, 46, 48, 49, 52, 53

*Driftwood Pipeline LLC,*
    183 FERC ¶ 62,153 (June 22, 2023)......................................................1

*Driftwood Pipeline LLC,*
    185 FERC ¶ 62,064 (Nov. 6, 2023) .......................................................1

*Fla. Se. Connection, LLC Transcon. Gas Pipe Line Co., LLC Sabal Trail Transmission, LLC,* 164 FERC ¶ 61,099 (Aug. 10, 2018) ...................................52

*LA Storage, LLC,*
    180 FERC ¶ 61,188 (Sept. 23, 2022) ........................................... 15, 41

*Lake Charles LNG Co., LLC,*
    153 FERC ¶ 61,300 (Dec. 17, 2015) ............................................ 19, 36

*Magnolia LNG, LLC,*
    155 FERC ¶ 61,033 (Apr. 15, 2016)............................................. 19, 36

*Venture Global Calcasieu Pass LNG, LLC,*
    166 FERC ¶ 61,144 (Feb. 21, 2019)............................................. 19, 36

**Other Authorities**

*Driftwood LNG, LLC*, DOE/FE Order No. 3968, FE Docket No. 16-144-LNG
(Feb. 28, 2017) ................................................................................... 18, 34

*Driftwood LNG, LLC*, DOE/FE Order No. 4373, FE Docket No. 16-144-LNG
(May 2, 2019) .......................................................................................... 35

*Nat'l Env't Policy Act Guidance on Consideration of Greenhouse Gas Emissions
and Climate Change*, 88 Fed. Reg. 1,196 (Jan. 9, 2023) .............................. 10, 11

U.S. Forest Service, *Roadless Area Conservation; National Forest System Lands
in Colorado*; 81 Fed. Reg. 91,811 (Dec. 19, 2016) ............................................ 52

# GLOSSARY

The following acronyms and abbreviations are used in this brief:

| | |
|---|---|
| CO$_2$e | Carbon dioxide equivalents |
| Dth/d | Dekatherms per day |
| EIS | Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| GHG | Greenhouse gas |
| NEPA | National Environmental Policy Act |
| SA__ | Supplemental Appendix |
| SC-GHG | Social Cost of Greenhouse Gases |

## JURISDICTIONAL STATEMENT

Petitioners Healthy Gulf and Sierra Club seek review of a Federal Energy Regulatory Commission order issued under section 7(c) of the Natural Gas Act, 15 U.S.C. 717f(c), authorizing Respondent-Intervenor Driftwood Pipeline LLC to construct and operate two interstate natural gas pipelines ("Lines 200-200"). *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 (Apr. 21, 2023) ("200-300 Certificate"). R.213 [JA661].

Petitioners filed a timely motion to intervene, R.12 [JA112], which was granted by operation of 18 C.F.R. 385.214(c)(1). R.213, P14 [JA666].  On May 22, 2023, Healthy Gulf filed a timely request for rehearing of the Certificate. R.217 [JA708]. On June 22, 2023, FERC issued a Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 183 FERC ¶ 62,153, stating "that the rehearing request… will be addressed in a future order to be issued consistent with the requirements of… 15 U.S.C. 717r(a)". R.220 [JA753].

Healthy Gulf and Sierra Club then timely petitioned this court for review of the 200-300 Certificate, and, on November 6, 2023, FERC issued a second Notice of Denial of Rehearing by Operation of Law, 185 FERC ¶ 62,064, stating that it would not further address their rehearing request. R.221 [JA754].

## ISSUES FOR REVIEW

1. Where FERC had previously issued a section 7 certificate of public convenience and necessity for a pipeline based solely on its affiliate precedent agreement to supply a natural gas export terminal with 100% of its requirements, did FERC violate the Natural Gas Act by issuing a section 7 certificate for Lines 200-300 based on its affiliate precedent agreement to also supply the same terminal with 100% of its requirements?

2. Knowing that the purpose of Lines 200-300 was to supply all of the export terminal's needs, did FERC violate the National Environmental Policy Act ("NEPA") by segmenting the environmental review of Lines 200-300 from the environmental review of the export terminal?

3. Did FERC violate NEPA and 18 C.F.R. 157.14(a)(11) by refusing to determine the impacts of upstream gas development as indirect effects of Line 200-300?

4. Did FERC violate NEPA and its own regulations by refusing to determine the significance of Lines 200-300's direct or indirect greenhouse gas emissions?

5. Did FERC violate the Natural Gas Act by refusing to weigh Lines 200-300's direct or indirect greenhouse gas emissions in its determination that the project was required by the public convenience and necessity?

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an addendum.

## STATEMENT OF THE CASE

## I.    INTRODUCTION

Petitioners Healthy Gulf and Sierra Club ("Healthy Gulf") are challenging FERC's 2023 authorization (the "200-300 Certificate"), R.213 [JA661], for twin pipelines ("Lines 200-300" or "200-300") intended to supply the previously-authorized Driftwood LNG export terminal (the "Driftwood Terminal" or "Terminal"), located in Calcasieu Parish, Louisiana. Both the Terminal and 200-300 are wholly-owned subsidiaries of Tellurian, Inc.

FERC justified its finding of project need based almost entirely on 200-300's precedent agreement with the Driftwood Terminal to supply it with 100% of its feedstock needs for 20 years. However, when FERC approved the Terminal in 2019, it also issued a section 7 certificate for a pipeline (the "Mainline") based solely on *its* precedent agreement with the Driftwood Terminal to supply it with 100% of its feedstock needs. Like the Terminal and Lines 200-300, the Mainline is also owned by Tellurian, Inc. Having previously justified the Mainline based on its affiliate precedent agreement to supply the Terminal with 100% of its requirements, FERC violated the Natural Gas Act by finding Lines 200-300 were also needed based on a second affiliate precedent agreement to provide the same supply.

Alternatively, if 200-300 is needed because it is replacing the Mainline as the Terminal's supply, then NEPA required FERC to analyze Lines 200-300

4

together with the Driftwood Terminal as a single project, just as FERC had analyzed the Mainline and the Terminal together. Agencies must consider "connected" actions together in a single Environmental Impact Statement, rather than to segment review across separate documents. 40 C.F.R. 1501.9(e)(1). There is no doubt that Lines 200-300 and the Driftwood Terminal are a single project; no sooner had FERC approved the Driftwood Terminal and the Mainline than Driftwood began planning to replace the Mainline with 200-300. More to the point, long before FERC approved Lines 200-300, Driftwood *told* FERC that 200-300 – and *not* the Mainline –was going to be its sole gas supply, and that building the Mainline would not even start – if ever – until *after* both the Terminal and Lines 200-300 were completed and operating. Despite FERC knowing that Lines 200-300 and the Driftwood Terminal were a single project, FERC refused to consider them as such for purposes of NEPA.  And, adding insult to injury, FERC did not disclose this rather critical piece of information in any document connected with the Lines 200-300 application; instead, it let the cat out of the bag in a completely separate and unconnected pipeline docket.

FERC's treatment of greenhouse gases ("GHGs") – yet again – presents the third set of issues. NEPA, as well as FERC's own regulations, require an environmental impact statement to identify "significant" project impacts. In deciding whether to approve a pipeline under Natural Gas Act section 7, FERC

"balances the public benefits against the potential adverse consequences." And FERC claims that environmental impacts are one of the factors it weighs; presumably that includes "significant" ones.

But in approving Lines 200-300, FERC twisted itself into knots in order to avoid answering two simple but critically important questions – whether the greenhouse gas emissions from *any* portion of the production, transportation, and use of the gas 200-300 will carry are "significant" and, if so, do they outweigh the pipeline's public benefits.

Because they are "foreseeable" consequences, FERC was willing to quantify the comparatively small (but still significant) GHG emissions from building and operating 200-300, and the emissions from the 1.5% of 200-300's capacity that will be burned in a local power plant. But FERC would not quantify the upstream GHG emissions from producing the gas 200-300 carry, because it allegedly doesn't know what they will be, refused to ask Driftwood about them, and refused to explain why it won't use any of the tools other agencies use to estimate those emissions.

Even as to the GHG emissions that FERC conceded are "foreseeable", FERC refused to deem them "significant" under NEPA or consider them in determining under the Natural Gas Act whether 200-300's alleged benefits outweigh its environmental impacts. In fact, FERC would not deem them either

6

"significant" or "insignificant", because it was "unable to identify any such appropriate criteria" or any "scientifically accepted method that would enable the Commission to determine the significance" of these emissions.

This is all the more remarkable because FERC states that it evaluates projects "by balancing the evidence of public benefits to be achieved against the residual adverse effects" (*i.e.*, after those effects have been "minimized"), and characterizes this as "essentially an economic test." Yet when presented with a tool (the "Social Cost of Greenhouse Gasses" or "SC-GHG") that many other agencies use to quantify the economic impacts of greenhouse gas emissions, FERC said that while it "may have utility in certain contexts such as rulemakings", the Social Cost of Carbon nevertheless "does not enable the Commission to determine credibly whether the reasonably foreseeable GHG emissions associated with a project are significant or not significant in terms of their impact on global climate change." FERC did not explain its reasoning why the Social Cost of Greenhouse Gasses "may have utility" in rulemakings, but not in individual project decisions; FERC is the only agency that has made this distinction and – as FERC has acknowledged – other agencies have no problem using the SC-GHG in evaluating individual projects.

Nor did FERC acknowledge this court's decision in *Vecinos para el Bienestar de la Comunidad Costera v. FERC,* 6 F.4th 1321 (D.C. Cir. 2021),

7

which remanded a section 7 certificate to FERC because it failed to address NEPA's mandate that an agency can't just throw up its hands and say there's no way to make a significance determination; in the end, the environmental impact statement must contain "the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community," *id.* at 1328, quoting 40 C.F.R. 1502.21(c).

Such contortions violate NEPA and the Natural Gas Act; FERC violated NEPA by refusing to determine 200-300's upstream greenhouse gas emissions as an indirect effect of the project, and refusing to consider the significance of the greenhouse gas emissions it conceded were impacts from building and operating 200-300. FERC then violated the Natural Gas Act by then refusing to weigh these rather consequential impacts against the "need" for this pipeline.

## II.   LEGAL FRAMEWORK

### A. Natural Gas Act

Section 7 of the Natural Gas Act, 15 U.S.C. 717f, provides that FERC must approve construction and operation of any pipeline that will transport gas in interstate commerce, and that FERC may only authorize a pipeline if it determines that it is "required by the present or future public convenience and necessity." *Id.* 717f(e). FERC "will issue a certificate . . . only if a project's public benefits (such as meeting unserved market demand) outweigh its adverse effects (such as a

8

deleterious environmental impact on the surrounding Community).” *City of Oberlin v. FERC*, 937 F.3d 599, 602 (D.C. Cir. 2019).

B.  National Environmental Policy Act (“NEPA”)

NEPA requires federal agencies to take a hard look at the environmental consequences of their proposed actions. The point of this is to ensure that the agency’s decisions are fully informed, and to facilitate public participation by ensuring “that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking.” *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (citation omitted).

For major projects, the “hard look” takes the form of an environmental impact statement (“EIS”), which includes considerations such as “the environmental effects of the proposed agency action,” “any . . . adverse environmental effects which cannot be avoided should the proposal be implemented,” and “alternatives to the proposed agency action.” 42 U.S.C. 4332(C). FERC’s own regulations presume that section 7 pipelines require an EIS. 18 C.F.R. 380.6(a)(1).

NEPA requires agencies to take a broad perspective when considering what a project’s environmental impact will be. Agencies must look beyond the direct effects of the specific proposal, analyzing both reasonably foreseeable “indirect effects,” 40 C.F.R. 1508.1(g)(2), and the effects of “connected,” (*id*. 1501.9(e)(1))

and "cumulative," (*id.* 1508.1(g)(3)) actions. These requirements prohibit "segmentation" of the comprehensive review NEPA requires. *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014).

Finally, NEPA requires that an EIS shall include "the environmental impacts of the proposed action . . . and the significance of those impacts." 40 C.F.R. 1502.16(a)(1). And FERC's own regulations require that an EIS include "[t]he significant environmental impacts of the proposed action." 18 C.F.R. 380.7(a).

Recognizing that "[t]he United States faces a profound climate crisis and there is little time left to avoid a dangerous—potentially catastrophic—climate trajectory", the Council on Environmental Quality, the agency responsible for implementing NEPA, has issued guidance "to assist agencies in analyzing greenhouse gas (GHG) emissions and climate change" "when evaluating proposed major Federal actions." *Nat'l Env't Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change*, 88 Fed. Reg. 1,196, 1,196-97 (Jan. 9, 2023) (the "Greenhouse Gas Guidance").

> Given the urgency of the climate crisis and NEPA's important role in providing critical information to decision makers and the public, NEPA reviews should quantify proposed actions' GHG emissions, place GHG emissions in appropriate context and disclose relevant GHG emissions and relevant climate impacts, and identify alternatives and mitigation measures to avoid or reduce GHG emissions.

*Id.* at 1,197 One of the tools that the Greenhouse Gas Guidance endorses is the Social Cost of Greenhouse Gases ("SC-GHG"), and "[i]n most circumstances,

once agencies have quantified GHG emissions, they should apply the best available estimates of the SC-GHG to the incremental metric tons of each individual type of GHG emissions expected from a proposed action and its alternatives." *Id*. at 1,202 (footnotes omitted). This is because the "SC-GHG provides an appropriate and valuable metric that gives decision makers and the public useful information and context about a proposed action's climate effects even if no other costs or benefits are monetized, because metric tons of GHGs can be difficult to understand and assess the significance of in the abstract." *Id*. "Certain circumstances may make monetization using the SC-GHG particularly useful, such as . . . if the significance of climate change effects is difficult to assess or not apparent to the public without monetization." *Id*. at 1,203. Finally, the Greenhouse Gas Guidance "is applicable to *all* Federal actions subject to NEPA". *Id.* at 1,198 (emphasis added).

## III.    FACTUAL BACKGROUND

### A. The Driftwood Project

On March 31, 2017, Driftwood LNG LLC and Driftwood Pipeline LLC applied to FERC for permission to build and operate an LNG export terminal (the "Driftwood Terminal") and a pipeline (the "Mainline") to supply it (together, the "Driftwood Project"). Application for Authorizations under Sections 3 and 7 of the Natural Gas Act, *Driftwood LNG LLC*, FERC Dkt. CP17-117, Accession No.

20170331-5055 (Mar. 31, 2017) ("Driftwood Application"), p.3, Supplemental

Appendix ("SA") [SA___].

The LNG Terminal "will consist of five identical LNG plants" (Driftwood

Both Driftwood LNG and Driftwood Pipeline are wholly-owned subsidiaries

of Tellurian, Inc. Order Granting Authorizations Under Sections 3 and 7 Of the

Natural Gas Act, *Driftwood LNG LLC*, FERC Dkt. CP17-117, 167 FERC ¶ 61,054

(Apr. 18, 2019) ("Driftwood Certificate"), P4.

The LNG Terminal "will consist of five identical LNG plants" (Driftwood

Application, p.3 [SA___]) and "[e]ach of the five LNG plants will be

commissioned and placed in service as construction is completed." *Id*., p.4

[SA___].  Because the Mainline was expressly designed to supply all of the

Driftwood Terminal's needs, it would also be constructed in phases, "in order to

match the corresponding construction schedule of the Driftwood LNG Project",

*viz.*:

> Following the completion of Phase 1, the [Mainline] will have sufficient
> capacity to supply feed gas to up to three liquefaction plants; after the
> completion of Phase 2, the project will have sufficient capacity to supply up
> to four plants; and after the completion of Phase 3, the project will have
> sufficient capacity to support operation of all five proposed liquefaction
> plants.

Driftwood Certificate, P13. Per this plan, Driftwood LNG executed a "binding"

precedent agreement with Driftwood Pipeline for 100% of the Mainline's capacity

(*id*. P18) and, expressly based on that affiliate precedent agreement, on April 18, 2019, FERC granted the Mainline a section 7 certificate. *Id*. P35.[1]

Tellurian, parent company of both Driftwood LNG and Driftwood Pipeline, has been forthcoming about the source of the gas for the Terminal, *e.g.*, Tellurian's chief of production said that the company has "plans to drill 13 wells in the Haynesville shale [in 2022] that it will operate, as it looks to build sufficient feed gas supplies to support the first phase of its proposed Driftwood LNG export terminal in Louisiana" (R.192, p.2) [JA410] and "We have been diligently growing our natural gas production and reserves in the Haynesville. These assets provide Tellurian with both cash flow and a physical hedge for Driftwood LNG." *Id*. Attach. 1, p.2 [JA414].

B.  Lines 200-300

The ink was hardly dry on the 2019 Driftwood Certificate – and no construction of either the Terminal or the Mainline had begun – when Driftwood Pipeline began planning Lines 200-300 and, by November, 2020, it had already mapped out the project route and "began engaging agencies and other stakeholders." 200-300 Application, Volume 1B; Resource Report 1- General

---

[1] Despite FERC's fetish for using the word "binding" to describe precedent agreements between affiliates, they aren't.  The two parties to both the Mainline and 200-300 precedent agreements – Driftwood LNG and Driftwood Pipeline –are wholly-owned subsidiaries of Tellurian.

Project Description, R.1, 1-36 [JA071]. FERC was presumably among those unnamed agencies, and on March 29, 2021, Driftwood Pipeline announced an open season, seeking buyers for 200-300's capacity. 200-300 Certificate, R.213, P13 [JA666]. Despite Driftwood Terminal's previous precedent agreement with Driftwood Pipeline for the Mainline's entire capacity, the Terminal and Driftwood Pipeline now signed a second precedent agreement for 93% of Lines 200-300's capacity. *Id*. P24 [JA670].[2] Two other entities subscribed for 1.5% each of 200-300's capacity, for a total of 96%. *Id*. P13 [JA666]. And on June 17, 2021, Driftwood Pipeline filed its application for Lines 200-300 ("200-300 Application"). *Id*. P1 [JA661].

Line 200 would be 36.9 miles long and run from Ragley, Louisiana to the Terminal (200-300 Certificate, R.213, P4 [JA662]); the 34-mile long Line 300 would start at mile 4.5 of Line 200, be "collocated" with Line 200 for its entire length, and would also end at the Terminal. *Id.* 200-300 was designed with a nominal capacity of 5.4 million dekatherms per day ("Dth/d), with peak seasonal capacity of 5.7 million Dth/d. R.213, P1 [JA661].

On April 4, 2022, nine months after the 200-300 application was filed, the Terminal finally began mobilizing for construction. Driftwood Monthly

---

[2] The precedent agreement was for 5 million Dkt/d (200-300 Certificate, R.213, P13 [JA661]), which is 92.59% of 200-300's 5.4 million Dkt/d capacity; for convenience petitioners have rounded this figure up to 93%.

Construction Report, Apr. 2022, FERC Dkt. CP17-117, Accession No. 20220520-5222, p.1. But Driftwood did not – and now, 21 months later, *still* has not – commenced construction of the Mainline.[3]

On September 23, 2022, FERC issued a certificate for an unrelated gas storage project. Order Issuing Certificate, *LA Storage, LLC*, FERC Dkt. CP21-44,180 FERC ¶ 61,188 ("Hackberry Certificate"). The Hackberry Certificate considered both the Driftwood project and Lines 200-300 to be within the "geographic scope" of its NEPA cumulative impacts analysis. *Id.*, App. A, p. 42. As a result, the Hackberry Certificate contained two remarkable statements about Lines 200-300, the LNG Terminal, and the Mainline:

> Driftwood LNG Project (CP17-117 and CP17-118). The project sponsors, Driftwood LNG, LLC and Driftwood Pipeline, LLC, anticipate that construction of the terminal would take place from late-2022 through 2026. Driftwood Pipeline, LLC has stated that it does not anticipate commencing construction of the project pipeline until after construction of the Line 200 and Line 300 Project is complete (mid-2026).

*Id.*, p.43.

---

[3] FERC's October 26, 2023 Inspection Report (FERC Dkt. CP17-117; Accession No. 20231116-3045), p.3 [SA___] reported that "Driftwood stated that construction activity for the Driftwood Pipeline [the Mainline] had not yet commenced at the time of the FERC inspection." Driftwood's Monthly Construction Report for October, 2023 (FERC Dkt. CP17-117; Accession No. 20231120-5109), filed on November 20, 2023, does not mention of any construction on the Mainline.

Whoa. In the middle of the Line 200-300 process – and only days after FERC had issued the 200-300 Environmental Impact Statement ("200-300 EIS") – FERC disclosed that (1) the Driftwood Terminal will be finished by 2026; (2) that Driftwood plans to have Lines 200-300 finished by "mid-2026", and (3) that Driftwood is not even going to start building the Mainline Pipeline (the "project pipeline") – which FERC had approved *solely* on the basis of a "binding" precedent agreement to supply all of the Terminal's requirements – until *after both the LNG Terminal and Lines 200-300 are completed.* Thus, seven months before it issued the Lines 200-300 Certificate, FERC knew that Lines 200-300 and the Driftwood Terminal were indeed a single project (and, incidentally, that FERC's sole justification for the Mainline was no longer valid).  Remarkably, there is not a word about this in the Lines 200-300 docket.

## C. The 200-300 Certificate

FERC issued the Lines 200-300 Certificate on April 21, 2023, seven months after inadvertently blurting out the truth about 200-300 being the Driftwood Terminal's sole source of gas. The Certificate confirmed, *sub silento*, that this was Driftwood's plan; just as Driftwood had carefully phased work on the Mainline "to match the corresponding construction schedule of the Driftwood LNG Project" (Driftwood Certificate, P13), Driftwood was now phasing Lines 200-300 to do the same: "The 'Phase I facilities' will have a nominal transportation capacity of

16

3,100,000 Dth/d" (200-300 Certificate, R.213, P8 [JA664]) and, according to

Driftwood, "will take approximately 12 months to construct." 200-300

Application, R.1 at 10 [JA012]. The Terminal's share of that capacity (93%) is

approximately 2.9 mDth/d, which would be able to supply the first three Terminal

units.[4]  Phase II of the 200-300 construction would take another 18 months (*id.*),

and would bring the Terminal's share of total capacity to 5.0 mDth/day (200-300

Certificate, R.213, P8 [JA664]), enough for all five Terminal units.

FERC's decision rested primarily on the precedent agreement between the

Driftwood Terminal and Driftwood Pipeline. 200-300 Certificate, R.213, P13

[JA666]. "We acknowledge that the foundation shipper, Driftwood LNG, has

contracted for approximately 92% (*sic*) of capacity and is an affiliate of Driftwood

Pipeline. Notwithstanding this relationship, we find, under the facts presented, that

the precedent agreements demonstrate project need." *Id.* P24 [JA670] (footnote

omitted).  While FERC conceded that "Driftwood LNG has not asserted that there

is insufficient supply for its authorized exports" to be provided by the Mainline,

nevertheless "the Line 200 and Line 300 Project would provide the shipper with

additional supply options, enhancing the diversity, resilience, and reliability of its

supply." *Id.* P27 [JA671]. Apparently, that is because the Mainline and 200-300

---

[4] The Mainline's Phase 1 would carry 2.335 million Dth/day (Driftwood Certificate
P39), and had been designed to supply the first three Terminal units. *Id*. P13.

17

"have different origination points and access to different pools of gas at differing pressures and supply availability", R.218, p.7 [JA739], since 200-300 would interconnect with four pipelines that the Mainline did not. R.213 P27 n.48 [JA672].

FERC's "additional supply options" rationale is a fallacy. Because 200-300 was replacing the Mainline, not supplementing it, and has *fewer* interconnections with other pipelines than the Mainline, using 200-300 would actually *reduce* the "diversity, resilience, and reliability" of the Terminal's supply.[5] And when the Department of Energy had granted the Terminal export authority, it specifically noted that the Mainline "will connect up to 15 existing interstate pipelines and storage facilities" (Order Granting Long-Term, Multi-Contract Authorization to Export Liquefied Natural Gas by Vessel from the Proposed Driftwood LNG Facility in Calcasieu Parish, Louisiana to Free Trade Agreement Nations, *Driftwood LNG, LLC*, DOE/FE Order No. 3968, FE Docket No. 16-144-LNG (Feb. 28, 2017), p.4 [SA___]) and thus "the Driftwood LNG Facility will have the capability to access the entire national natural gas pipeline grid through various interconnections." *Id.* p.5 [SA___]. Apparently "the entire national natural gas pipeline grid" wasn't enough.

---

[5] Petitioners do not know why Driftwood wants to replace the Mainline with 200-300, but note that 200-300 would cost approximately $1.5 billion (200-300 Certificate, R.213, P12 [JA666]), and the Mainline approximately $2.3 billion (Driftwood Certificate P17).

Moreover, none of the area's other six LNG export terminals (five approved and one pending) has said that they needed an entirely duplicative supply pipeline. Five of the six have a single supply pipeline, and only one (Lake Charles LNG) needed a second pipeline, which was specifically added years later in order to expand the terminal's capacity.[6]

FERC also offered a fallback justification: while there is apparently plenty of gas further north in Louisiana, "the Lake Charles region further south would likely face pipeline constraints in the face of growing LNG feedgas demand and lack of sufficient pipeline infrastructure" and thus "the Line 200 and Line 300 Project would relieve expected pipeline constraints." 200-300 Certificate, R.213, P25 [JA671]. Lines 200-300 could also help relieve such constraints because they have "bi-directional flow capabilities that the Driftwood Mainline system does not." *Id.* P27 [JA671].

---

[6] Order Granting Section 3 and Section 7 Authorizations and Approving Abandonment, *Lake Charles LNG Co., LLC*, 153 FERC ¶ 61,300, PP7, 8, n.10 (Dec. 17, 2015); Order Granting Authorization Under Section 3 of The Natural Gas Act and Issuing Certificates, *Magnolia LNG, LLC*, 155 FERC ¶ 61,033, P5 (Apr. 15, 2016); Order Granting Authorization Under Section 3 of the Natural Gas Act and Issuing Certificates, *Cameron LNG, LLC*, 147 FERC ¶ 61,230,  P7 (June 19, 2014); Order Granting Authorization Under Section 3 of the Natural Gas Act, *Commonwealth LNG, LLC*, 181 FERC ¶ 61,143, PP 3, 4 (Nov. 17, 2022); Order Granting Authorizations Under Sections 3 and 7 of the Natural Gas Act, *Venture Global Calcasieu Pass LNG, LLC*, 166 FERC ¶ 61,144, P8 (Feb. 21, 2019); Final Environmental Impact Statement for Venture Global CP2 LNG, LLC's CP2 LNG and CP Express Projects, FERC Dkt. CP22-21-000, Accession No. 20230728-3008 (July 28, 2023), p.2.

Driftwood and the other six area LNG terminals lie in a straight line due north-south, from Lake Charles, LA to Cameron, LA.[7] All are within 25 miles of Driftwood. 200-300 EIS, R.199, 4-6 to 4-7 [JA490-491]. Two, Lake Charles LNG and Magnolia LNG, are within 4 miles. *Id*. 4-147 [JA631]. None of them have anticipated any area constraints on natural gas supplies, including the four that are even further south than Driftwood. In any event, FERC does not explain how Lines 200-300 (and its "bi-directional flows") could possibly be of use to anyone else; 93% of 200-300's gas is not only spoken for, it will be flowing in only one direction –to the Driftwood Terminal – and there won't be much left over for anyone else.

FERC also failed its NEPA obligations in both the 200-300 EIS and the 200-300 Certificate. The 200-300 EIS is deficient because FERC knew that 200-300 was designed to be the Terminal's sole source of gas; as a single, interdependent project, NEPA required FERC to have analyzed 200-300's environmental impacts together with the Terminal's, rather than concealing this fact and splitting these impacts between two separate environmental impact statements.

---

[7]  From north to south these are Lake Charles LNG, Driftwood, Magnolia LNG, Cameron LNG, Commonwealth LNG, Calcasieu LNG, and CP2 LNG.

D. Greenhouse Gas Emissions

      i.   Upstream

FERC's greenhouse gas emissions analysis was also deficient, starting with ignoring 200-300's upstream emissions; the Certificate addressed these only in the middle of a footnote citing a previous FERC decision that if a pipeline is transporting gas intended for "export to other countries, the Commission will not consider the upstream or downstream GHG emissions" associated with the exported gas. 200-300 Certificate, R.213, P57, n.109 [JA685].

FERC refused to ask Tellurian about where and how the gas it planned for 200-300 would be produced, ignored the information that Petitioners supplied as to the source of that gas (R.192 [JA409]), and ignored Petitioners' comments (R.173, at 15-17 [JA375-377]) describing the modeling tools used by other agencies to estimate upstream greenhouse gas emissions from natural gas production.

      ii.   Construction and Operation

FERC did deem the emissions from 200-300's construction and operation as "foreseeable" and thus quantified them (at least in part). FERC estimated total construction $CO_2e$ emissions at 90,470 metric tons (200-300 Certificate, R.213, P57 [JA685]), annual emissions from 200-300's compressor station at 314,753

21

metric tons (*id.*), and annual pipeline operational emissions at 16,009 metric tons/year.[8] Unfortunately, FERC did not carry the math any further.

Multiplying the annual emissions from the compressor station and pipeline operations by the estimated 20-year project life (R.199, 4-127-128 [JA611-612]) yields total compressor station emissions of 1,809,400 metric tons $CO_2e$, and total pipeline operations emissions of 320,180 metric tons $CO_2e$ (together, the "operations emissions"). Adding those operations emissions together with the construction emissions yields total construction and operations emissions of 2,220,059 metric tons $CO_2e$. Because FERC did not do any of this math, Petitioners are left to assume that this is the amount referred to when FERC concluded that (200-300 Certificate, R.213, P62 [JA688]):

the reasonably foreseeable emissions from construction and operation of this project are calculated to result in a total social cost of GHGs equal to $629 million, $2.4 billion, and $3.6 billion, respectively.[9]

However, FERC prefixed this by stating that it was disclosing this calculation only "[f]or informational purposes" (200-300 Certificate, R.213, P61 [JA687]), and, by implication, FERC did not use them in making its section 7 determination.

[8] R.199, Table 4.12.4-2 [JA605]; because the EIS gives the pipeline operations figure as 17,647 short tons/year, petitioners have converted this to metric tons by multiplying by 0.907185. For some reason, after providing this figure for annual pipeline operational emissions, this quantity disappears from further discussion in both the EIS and Certificate.

[9] The range of figures reflects the different discount rates of 5%, 3% and 2.5%. 200-300 Certificate, R.213, P62 [JA688].

iii.   Downstream

FERC would only estimate the "downstream" emissions from 1.5% of 200-300's capacity, because "only the capacity subscribed to Entergy Louisiana, LLC will have reasonably foreseeable downstream GHG emissions" (200-300 Certificate, R.213, P58, n.113 [JA686]), and FERC estimated those emissions at 1.93 million metric tons/year. *Id.* P57 [JA685].  FERC refused to estimate the emissions from use of any of the rest of 200-300's gas (some 94.5% of 200-300's subscribed capacity), because "[t[he downstream emissions resulting from the capacity subscribed by Driftwood LNG and Sequent Energy Management LLC are not reasonably foreseeable because, respectively, the record shows that these shippers' capacity will be used to export natural gas and does not have an identified end-use." *Id.* P57 n.109; [JA685].

Having estimated what it regards as the only "foreseeable" downstream GHG emissions, again FERC went no further. FERC did not bother to multiply these 1.93 million metric tons of emissions by the project's 20-year lifespan, which would come to 38.6 million metric tons $CO_2e$. And, while FERC was willing to use the Social Cost of Greenhouse Gasses to calculate the impacts of the 2 million tons of operational $CO_2e$ emissions ("for informational purposes"), FERC wasn't going to do that with 38.6 million tons.

Because both 200-300's operational emissions and the "foreseeable" downstream emissions would both take place over the same 20-year span, it seems reasonable to derive an estimated SC-GHG figure for the latter by multiplying FERC's SC-GHG calculation for the former by 17.5. Multiplying the $629 million, $2.4 billion, and $3.6 billion amounts that FERC gave for operations emissions (200-300 Certificate, R.213, P62 [JA688]) yields $11 billion, $42 billion, and $63 billion in impacts – and all from burning just 1.5% of 200-300's gas. Adding FERC's operations impacts to the "foreseeable" downstream combustion impacts yields Social Cost of Greenhouse Gasses totals of $11.6 billion, $44.4 billion, and $66.6 billion, respectively.

FERC refused to characterize any of the emissions it acknowledged as "significant" because "there currently are no accepted tools or methods for the Commission to use to determine significance, therefore the Commission is not herein characterizing these emissions as significant or insignificant." 200-300 Certificate, R.213, P63 [JA689] (footnotes omitted). As a result, FERC did not weigh these emissions impacts in its section 7 determination that 200-300 served the public convenience and necessity.

## SUMMARY OF ARGUMENT

FERC claimed that 200-300 is needed based primarily on an affiliate precedent agreement to supply the Driftwood Terminal with 100% of its feedstock

needs for 20 years. 200-300 Certificate, R.213, P24 [JA670]. But when FERC

originally approved the Terminal, FERC had also issued a section 7 certificate for

the Mainline based solely on *its* precedent agreement with the Driftwood Terminal

to supply it with 100% of its feedstock needs.

FERC violated the Natural Gas Act by issuing section 7 certificates to two

separate pipelines, each based on a single affiliate precedent agreement to supply

the Terminal with all the gas it needs. FERC may justify either the Mainline or

200-300 based on their respective precedent agreements with the Terminal, but not

both.

FERC does not claim that there has been any change in the Terminal's needs

since it approved the Mainline, or that the Terminal plans to increase its export

capacity.  The best that FERC can come up with is that 200-300 will increase the

Terminal's "diversity, resilience and reliability of supply" because 200-300 will

interconnect with four pipelines that the Mainline doesn't. 200-300 Certificate,

R.213, P27 [JA671]. Because *every* pipeline can be said to improve "diversity,

resilience and reliability of supply", FERC could justify literally *any* pipeline

merely by invoking these magic words.  And, ironically, because the Mainline has

more interconnections with other pipelines than 200-300, replacing the Mainline

with 200-300 actually reduces the Terminal's "diversity, resilience and reliability

of supply". Moreover, none of the other six area LNG export terminals have

25

expressed any need for such "diversity, resilience and reliability of supply" or concerns about future local supply constraints, and each relies on a single pipeline to deliver their gas.

FERC's fallback justifications are equally meritless. FERC touts that 200-300 has "bi-directional" pipelines, and will generally "add reliability, flexibility, and liquidity to the region", (*id.*), but FERC fails to explain how this will happen when virtually all of 200-300's gas will be going in one direction, to one customer.

FERC also violated NEPA by separately analyzing the environmental impacts of 200-300 and the Terminal. "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). "Actions are 'connected' if they trigger other actions, cannot proceed without previous or simultaneous actions, or are 'interdependent parts of a larger action and depend on the larger action for their justification.'" *Id.* at 1309 (quoting 40 C.F.R. 1508.25(a)(1) (1978)).

The LNG Terminal and Lines 200-300 are "connected" actions, which NEPA requires FERC to consider in a single, comprehensive document. 40 C.F.R. 1501.9(e)(1).  Driftwood has made the Terminal completely dependent on 200-300 for its gas supply and 200-300 has no purpose aside from supplying the Terminal.

FERC evaluated the Terminal and the Mainline together in a single environmental impact statement (Final Environmental Impact Statement for Driftwood LNG, LLC and Driftwood Pipeline, LLC's Driftwood LNG Project, FERC Dkt. CP17-117, Accession No. 20190118-3018 (Jan. 18, 2019) [SA___]); because 200-300 is now replacing the Mainline, NEPA requires that FERC prepare a single EIS for the Terminal and 200-300.

Moreover, FERC knew that 200-300 was going to replace the Mainline at least seven months before it issued the 200-300 Certificate, leaving it plenty of time to reopen the NEPA process or, at an absolute minimum, disclose this critically important fact in the 200-300 docket and allow the public to request that it do so.

FERC's treatment of greenhouse gas emissions further violated both NEPA and the Natural Gas Act. First, FERC failed to analyze or consider "upstream" emissions despite readily available information on the project's probable sources of gas and available tools to estimate their emissions, while also evading its affirmative obligation to seek out this information. And, despite both the NEPA regulations and its own regulations requiring that it do so, FERC flatly refused to decide the "significance" of *any* of the foreseeable GHG emissions it conceded would come from operating Lines 200-300 and from the gas 200-300 would carry that would be burned. Had FERC done so this would have informed its analysis

first under NEPA, and then under the Natural Gas Act when FERC weighed Line 200-300's benefits against its adverse impacts.

FERC's excuse for skirting the significance determination is that it was "unable to identify any such appropriate criteria" or any "scientifically accepted method that would enable the Commission determine the significance" of these emissions (200-300 Certificate, R.213, P61 [JA687]), but FERC failed to explain how it was able to make "significance" determinations as to *every other conceivable environmental impact Lines 200-300 will have* when there is no methodology – at least no methodology revealed in the EIS or Certificate - as to how FERC makes those determinations. Moreover, after acknowledging that the Social Cost of Greenhouse Gasses is a generally accepted method of making such a determination as to greenhouse gases, FERC stated that while the SC-GHG might be a useful metric for regulatory decisions, it is not for project level ones. FERC did not explain why this is so especially, as FERC concedes, other agencies routinely apply it to project-level decisions. *Mountain Valley Pipeline, LLC*, 163 FERC ¶ 61,197 P281 n.772 (June 15, 2018) (citing project-level examples from the Bureau of Ocean Energy Management and Office of Surface Mining Reclamation and Enforcement).

Nor did FERC square its refusal to come up with any sort of methodology with NEPA's requirement that "if the information relevant to reasonably

28

foreseeable significant adverse impacts cannot be obtained because . . . the means to obtain it are not known, the agency shall include within the environmental impact statement . . . [t]he agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. 1502.21(c)(4)). FERC does not – and cannot – explain how it has complied with this court's decision in *Vecinos*, which remanded a section 7 certificate to FERC precisely because it failed to address this requirement.  6 F.4th at 1329-30.

Ultimately, FERC's purpose in refusing to characterize any greenhouse gas emissions as "significant" (or, indeed, as anything at all) had nothing to do with NEPA. Instead, it was to allow FERC to avoid taking the impacts of these emissions into account in determining whether to issue the requested section 7 certificate. Thus, FERC violated the Natural Gas Act by refusing to consider the impacts of these emissions in determining whether Lines 200-300 served "the public convenience and necessity" under section 7.

## STANDING

Petitioners Healthy Gulf and Sierra Club each have standing to bring this appeal. Their missions are germane to impacts of Lines 200-300, and each petitioner has members who live, work, and recreate in areas that will be affected by the project's construction and operation and would have standing to sue in their

own right. *See* Hughes Decl. ¶¶ 3, 4, 7 (discussing Sierra Club's mission, work and membership in the Lines 200-300 project area); Ozane Decl. ¶ 4 (member of both organizations); Robertson Decl. ¶¶ 10-16; Hayes Decl. ¶¶ 34-40 (discussing impacts of Lines 200-300 on Petitioners' members).

Roishetta Ozane is a member of both Healthy Gulf and Sierra Club, and has been a member of each since before this case was filed. Ozane Decl. ¶¶ 3-4.  Ms. Ozane, a single mother with six children, lives about 1.5 miles from 200-300's route. *Id.* ¶¶ 2, 8. Building and operating 200-300 will cause increased air and water pollution, noise, and traffic that will directly affect her and her children. *Id.* ¶¶ 8-13.  Project construction will generate more than 7 million pounds of conventional pollutants, R.199, 4-119 [JA603], and she is especially concerned about the effects of that on her daughter, whose asthma will be aggravated by these emissions. *Id.* ¶ 9.  Her daughter and two of her sons have eczema, which these emissions will also exacerbate.[10] *Id.*

---

[10]  "A number of cross-sectional studies revealed an association between exposure to air pollutants and eczema symptoms." "Influences of Environmental Chemicals on Atopic Dermatitis", *Toxicological Research,* Vol. 31, No. 2, (2015), p.90. This is especially true for vehicle emissions: one survey "over 30 thousands of children demonstrated that flexural eczema was positively associated with exposure to traffic-related air pollutants" and another study in an urban area "showed a strong positive relationships between the distance to the nearest main road and eczema." *Id*.

Ms. Ozane will be directly affected by the increased traffic during construction. She regularly drives of LA 90 and Interstate 10 (*id.* ¶ 10) and 200-300's construction will increase traffic on each of those roads by hundreds of trips every day. R.199, 4-86 [JA570]. She is also injured by the LNG Terminal; she regularly fishes and crabs with her children at Calcasieu Point Landing, directly across the water from the Terminal, and the Terminal construction has diminished her enjoyment of the site's natural beauty. Ozane Decl. ¶¶ 11-12; *see also* Hayes Decl. ¶¶ 36, 40 (describing impacts to Ms. Ozane's use of the area and Calcesieu Point).

Cynthia Robertson is a member of Sierra Club and has been so since before this case was filed.  Robertson Decl. ¶ 5. She is 65 and lives in Sulphur, LA. *Id.* ¶ 2.  Lines 200-300 will be built about a mile from her house, *id.* ¶ 7, and she regularly recreates at Frasch Park and Carlyss Park, each about a half mile from the pipeline route, *id.* ¶¶ 8, 13.

Project construction will generate hundreds of tons of particulate matter pollution (R.199, 4-119 [JA603]) which she is particularly concerned about. Robertson Decl. ¶ 12. She has a particulate matter air monitor in her yard, and when readings are high she avoids going outdoors, which reduces the time she can spend gardening or watching wildlife. *Id.* When particulate matter levels are high,

31

she also notifies nearby friends who have Chronic Obstructive Pulmonary Disease (COPD). *Id.*

Ms. Robertson is also concerned that construction noise will disturb her at home, and when she is visiting the two parks that are a half mile from the pipeline site. *Id*. ¶ 13. She is worried about the increased traffic construction will bring, especially on LA 90, which she uses almost every day, and LA 27, which she uses weekly. *Id.* ¶ 14.  In addition to traffic congestion, she is also worried about the increased accident risk and the impacts to those roads from heavy construction equipment.  *Id.* Ms. Robertson is also concerned about how the noise and emissions from project construction will affect wildlife, and how the project's destruction of wetlands will reduce her opportunities to see migratory birds. *Id.* ¶ 15; *see also* Hayes Decl. ¶¶ 36, 37, 39 (discussing these impacts on Ms. Robertson).

Finally, Lines 200-300 run through west Sulphur, LA, where Ms. Robertson works with low income residents on homelessness and health issues. Robertson Decl. ¶¶ 3, 8.  This is an environmental justice area. R.199, 4-97-99, 4-100 & Fig. 4.11.8-1 [JA581-583, 584]. Persons in these areas will suffer impacts on visual resources, socioeconomics, traffic, noise, air quality, and construction impacts. R.199, 4-109 [JA593]. Thus Ms. Robertson will be impacted by Lines 200-300 while working there. Hayes Decl. ¶ 38.

These injuries establish harm to a protectable interest. *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)) ("We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."). This Court can redress this harm by vacating the 200-300 Certificate.

## ARGUMENT

### I.    STANDARD OF REVIEW

FERC's decision "will be set aside as arbitrary and capricious if it is not the product of reasoned decisionmaking." *Del. Riverkeeper*, 753 F.3d at 1313. The court must determine whether the agency has "examine[d] the relevant data" and made "a rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

### II.    THERE IS NO NEED FOR LINES 200-300 THAT JUSTIFIES A SECTION 7 CERTIFICATE.

Granting the Lines 200-300 Certificate violated the Natural Gas Act's mandate that a section 7 certificate must be based on the need for a pipeline. FERC's primary justification was an affiliate precedent agreement under which Lines 200-300 would supply the LNG Terminal with 100% of the gas it needs for

its export operations, even though FERC previously justified its decision to grant a section 7 certificate to the Mainline pipeline based on *its* affiliate precedent agreement to supply the Terminal with 100% of the gas it needs for its export operations. One such pipeline may be justified by the public convenience and necessity; two cannot be.

FERC does not claim that there has been any change in the Terminal's needs, or that the Terminal plans to increase its export capacity. The best that FERC can come up with is that 200-300 will increase the Terminal's "diversity, resilience and reliability of supply" because 200-300 will interconnect with four pipelines that the Mainline doesn't. Because every pipeline can be said to improve reliability, FERC will be able to justify literally *any* pipeline merely by invoking "diversity and reliability", without more. Surely Congress meant more when it said section 7 certificates had to be justified on the basis of public convenience *and necessity*.

But in any event, as a factual matter FERC's numbers game doesn't add up; FERC knows that 200-300 will not be *joining* the Mainline as a second source of supply, it is *replacing it*. And given that the Mainline interconnects with *six* pipelines that 200-300 does not (200-300 Certificate, R.213, P27 n.48 [JA672]) approving 200-300 as the Terminal's sole source of supply actually *decreases*, not increases, its "diversity and reliability of supply".

Moreover, as the Department of Energy noted in its order granting the Terminal authority to export to countries with whom the U.S. has a Free Trade Agreement ("FTA"), the Mainline "will connect up to 15 existing interstate pipelines and storage facilities" (DOE/FE Order No. 3968, p.4 [SA___]) and thus "the Driftwood LNG Facility will have the capability to access the entire national natural gas pipeline grid through various interconnections." *Id.* p.5 [SA__]. DOE repeated this conclusion in its subsequent order granting the Terminal authority to export to non-FTA countries. Opinion and Order Granting Long-Term Authorization to Export Liquefied Natural Gas to Non-Free Trade Agreement Nations, *Driftwood LNG, LLC*, DOE/FE Order No. 4373, FE Docket No. 16-144-LNG (May 2, 2019), p.24. If the Mainline (and its 15 interconnections) gave Driftwood the capability "to access the entire national pipeline grid through various interconnections", it is difficult to see how 200-300 could improve upon that.

Even if the Mainline is someday built and joins 200-300 as a supply for the Terminal – which, in any event, will not be until many years after the Terminal has been operating and supplied exclusively by 200-300 – then any marginal increase in "diversity and reliability" of supply does not justify this project. Driftwood is just one of seven LNG terminals – six approved and one pending before FERC – that lie in a straight line due north-south, from Lake Charles, LA to Cameron, LA.

All are within 25 miles of Driftwood. R.199, 4-6-4-7 [JA490-491]; two, Lake

Charles LNG and Magnolia LNG, are within 4 miles. R.199, 4-147 [JA631]. Not

one of these other six terminals said that they needed an entirely duplicative supply

pipeline; five of the six have a single supply pipeline, and only one (Lake Charles

LNG) needed a second pipeline, which was specifically added years afterwards in

order to expand its export capacity.[11]

The fact that the Terminal will be consuming 93% of 200-300's capacity

also eliminates FERC's fallback rationales, such that 200-300 offers "bi-directional

flow capabilities that the Driftwood Mainline system does not" and, while there is

apparently plenty of gas further north in Louisiana, "the Lake Charles region

further south would likely face pipeline constraints in the face of growing LNG

feedgas demand and lack of sufficient pipeline infrastructure" and thus "the Line

200 and Line 300 Project would relieve expected pipeline constraints" (200-300

Certificate, R.213, P25 [JA671]) and "would add reliability, flexibility, and

liquidity to the region by alleviating capacity constraints anticipated to develop as

a result of the addition of LNG terminals coupled with the potential expansion of

the industrial and petrochemical sectors." *Id.* P27 [JA671].

---

[11] *Lake Charles LNG Co., LLC*, 153 FERC ¶ 61,300, PP7, 8, n.10; *Magnolia LNG, LLC*, 155 FERC ¶ 61,033, P5; *Cameron LNG, LLC*, 147 FERC ¶ 61,230, P7; *Commonwealth LNG, LLC*, 181 FERC ¶ 61,143, PP 3, 4; *Venture Global Calcasieu Pass LNG, LLC*, 166 FERC ¶ 61,144, P8 ; Venture Global CP2 Final Environmental Impact Statement, Accession No. 20230728-3008, p.2.

Since the gas will be going in precisely one direction – south, to the Terminal – any "bi-directional flow capabilities" are meaningless. Likewise – and putting aside the flimsiness of capacity constraints that are "anticipated to develop" and the "potential" expansion of the industrial and petrochemical sectors – it is hard to see how Lines 200-300 could provide any benefit to anyone aside from the Terminal, since the Terminal will be the destination for almost all of 200-300's gas.

This case bears a startling resemblance to *Environmental Defense Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021). *EDF* dealt with the decision by Spire STL, a Missouri utility, to apply for a section 7 pipeline on the basis of a single precedent agreement with its own subsidiary, Spire Missouri. Spire STL conceded that the pipeline was not needed to meet any new load; instead, "Spire STL claimed that [this] would result in other benefits, such as enhancing reliability and supply security, providing access to new sources of natural gas supply, and eliminating reliance on propane 'peak-shaving' during periods of high demand." *Id*. at 960.

Dismissing protests that, given there was no new demand, it could not rely on this one affiliate precedent agreement as evidence of market need, FERC granted the certificate. *Id*. FERC "stated that it would not 'second guess' Spire Missouri's purported 'business decision' in entering into the precedent agreement with Spire STL, even though the shipper and the pipeline were affiliates." *Id*.

37

Instead, "the benefits that the [proposed pipeline] will provide to the market, including enhanced access to diverse supply sources and the fostering of competitive alternatives, outweigh the potential adverse effects on existing shippers, other pipelines and their captive customers, and landowners or surrounding communities." *Id*. at 966.

This Court vacated the Spire certificate, noting that there was no basis for finding that the pipeline served the public convenience and necessity when it "was not meant to serve any new load demand, there was no Commission finding that a new pipeline would reduce costs, the application was supported by only a single precedent agreement, and the one shipper who was party to the precedent agreement was a corporate affiliate of the applicant who was proposing to build the new pipeline." *Id*. at 973.

As in *EDF*, there is no new load demand here; the Mainline was designed to be and approved as the Terminal's source for 100% of its needs. As in *EDF*, FERC's decision here was based on a single precedent agreement.[12] And, as in *EDF*, that precedent agreement was with an affiliate, as both 200-300 and the Terminal are wholly-owned subsidiaries of Tellurian. And FERC's conclusion here that "the Line 200 and Line 300 Project would provide the shipper with additional

---

[12] The Terminal's precedent agreement for 93% of 200-300's capacity is even larger than the one precedent agreement in *EDF*, which was for 87.5% of the pipeline's capacity. *EDF*, 2 F.4th at 963.

supply options, enhancing the diversity, resilience, and reliability of its supply"
(200-300 Certificate, R.213, P27 [JA671]) bears a remarkable resemblance to
FERC's conclusion about the Spire pipeline's "benefits", *i.e.*, "enhanced access to
diverse supply sources and the fostering of competitive alternatives", which this
Court deemed "arbitrary and capricious". *EDF*, 2 F.4th at 973, 976.

Similarly, *pace* the vaunted "bi-directional capabilities" and 200-300's
potential to relieve the capacity constraints "anticipated to develop" because of
additional LNG terminals (each of which has their own dedicated supply pipeline)
along with the nebulous "potential expansion of" other sectors, just as in *EDF*
there is no evidence of other public benefit.

## III. FERC VIOLATED NEPA BY NOT ANALYZING LINES 200-300 AND THE DRIFTWOOD LNG TERMINAL AS A SINGLE PROJECT.

It is impossible to describe the Driftwood Terminal and Lines 200-300 as
anything other than a single project. A single corporation, Tellurian, is building
both via its wholly-owned subsidiaries, and the purpose of one is to enable the
operation of the other. Lines 200-300 will provide all of the Terminal's supply, and
in turn, the Terminal has contracted for 93% of 200-300's capacity. The Terminal
cannot operate without 200-300, and 200-300 has no purpose other than to supply
the Terminal.

The chronology makes this even clearer. FERC authorized the Terminal and the Mainline in April, 2019. 200-300 Certificate, R.213, P3, n.5 [JA662]. Driftwood's next step was not to start building either the Terminal or the Mainline, but instead to start planning 200-300; Driftwood "began engaging agencies and other stakeholders in November of 2020" about 200-300 (Resource Report 1, R. 1, 1-36 [JA__]), which is the *latest* FERC would have heard about this. Soon thereafter, in March-April of 2021, Driftwood held an open season for 200-300 (200-300 Certificate, R.213, P13 [JA666]), during which the Terminal contracted for 93% of its capacity. Meanwhile, Driftwood still had not started construction on either the Terminal or the Mainline.

On June 17, 2021, Driftwood filed its section 7 application for 200-300 (200-300 Certificate, R.213, P1 [JA661]), still not having started construction on the Terminal or the Mainline. It was only nine months later, in March, 2022, while the 200-300 application was pending that Driftwood began to mobilize for construction on the Terminal,[13] but still did nothing about constructing the Mainline.

---

[13] The Driftwood Certificate (Driftwood Certificate Condition 9, p.51) requires that the Terminal file monthly reports about construction activity, and the Terminal filed its first monthly report on May, 20, 2022. Driftwood LNG Monthly Construction Report, Apr. 2022; Accession No. 20220520-5222. As noted above (p.15, n.3) the Mainline has still not started construction.

On September 15, 2022, FERC issued the 200-300 environmental impact statement. R.199 [JA451]. Eight days later, FERC publicly admitted – in a completely unrelated docket – that Driftwood:

> anticipate(s) that construction of the terminal would take place from late-2022 through 2026. Driftwood Pipeline, LLC has stated that it does not anticipate commencing construction of the project pipeline until after construction of the Line 200 and Line 300 Project is complete (mid-2026).

Hackberry Certificate, p.43. Thus, no later than September 23, 2022, seven months before it issued the 200-300 Certificate, FERC unequivocally knew that Lines 200-300 would be the Terminal's exclusive source of gas, and thus that the environmental impacts of 200-300 and the Terminal should be analyzed together. Having previously considered the Terminal and the Mainline a single project for purposes of NEPA, once Driftwood replaced the Mainline with 200-300, *a fortiori*, FERC should have considered the Terminal and 200-300 a single project for purposes of NEPA.

By not evaluating them together, FERC improperly "segmented" the NEPA analysis. "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper*, 753 F.3d at 1313. "Actions are 'connected' if they trigger other actions, cannot proceed without previous or simultaneous actions, or are 'interdependent parts of a larger action and depend on the larger

41

action for their justification.'" *Id.* at 1309 (quoting 40 C.F.R. 1508.25(a)(1) (1978)). "Cumulative" actions "have cumulatively significant impacts and should therefore be discussed in the same impact statement." *Del. Riverkeeper*, 753 F.3d at 1314 (quoting 40 C.F.R. 1508.25(a)(2) (1978)).

The purpose of this broad scope is to "ensure[]" a federal agency "can assess the true costs of an integrated project when it is best situated to evaluate different courses of action and mitigate anticipated effects." *City of Bos. Delegation v. FERC,* 897 F.3d 241, 251-52 (D.C. Cir. 2018). Evaluating the actions separately risks "foreclos[ing] the opportunity to consider alternatives," such as whether, in light of the totality of impacts, a lower-capacity alternative would better serve the public interest. *Del. Riverkeeper*, 753 F.3d at 1315.

*Delaware Riverkeeper* is the paradigm case for FERC improperly segmenting section 7 pipeline NEPA analyses. The project there was upgrading a single pipeline, which the proponent and FERC divvied up into four separate, continuous segments. The third of these segments was at issue; the first had already been approved and was under construction and applications for the second and fourth were pending before FERC. 753 F.3d at 1308. The Court applied a four-factor test it had created in *Taxpayers Watchdog v. Stanley,* 819 F.2d 294 (D.C. Cir. 1987) to determine if improper segmentation had occurred, where it asked whether a highway segment "(1) has logical termini; (2) has substantial

42

independent utility; (3) does not foreclose the opportunity to consider alternatives; and (4) does not irretrievably commit federal funds for closely related projects." *See Del. Riverkeeper*, 753 F.3d at 1315.

The Court decided that the first two factors, "logical termini" and "substantial independent utility" applied to the pipeline situation before it. As to the first, the Court noted that FERC had not explained why it had segmented a single pipeline into four segments with the termini it had chosen. The same is true here, on a simpler scale: given that 200-300 and the Terminal are a single, interdependent project, it made no sense for FERC to deem 200-300's terminus (and the limit of its EIS) at the point where it meets the Terminal.

More important was the "substantial independent utility" test, *i.e.*, "[t]he commercial and financial viability of a project when considered in isolation from other actions." *Id*. at 1316. Finding that the four segments of a single pipeline were both "functionally" and "financially" interdependent, the Court stated that, "[t]o interpret the 'substantial independent utility' factor to allow such fractionalization of interdependent projects would subvert the whole point of the rule against segmentation." *Id*. at 1317.

The same is true here. Driftwood has chosen to make the Terminal both functionally and financially absolutely dependent on 200-300 for its gas and vice

versa; aside from the Terminal, 200-300 had no other takers for its capacity than the two entities that subscribed for 1.5% each.

*Delaware Riverkeeper* also flatly rejected FERC's argument that "NEPA analyses should not cover projects already completed or not yet proposed." 753 F.3d at 1317-18. "The temporal nexus here is clear. Tennessee Gas proposed the Northeast Project while the 300 Line Project was under construction, and FERC plainly was aware of the physical, functional, and financial links between the two projects." *Id*. at 1318. The situation is even more egregious here, because when Driftwood applied for the Lines 200-300 certificate, it had not even started Terminal construction.

**IV.   FERC REFUSED TO PROPERLY CONSIDER DIRECT AND INDIRECT PIPELINE GREENHOUSE GAS EMISSIONS AND AS A RESULT VIOLATED THE NATURAL GAS ACT BY NOT INCLUDING THE IMPACTS OF THESE EMISSIONS IN ITS SECTION 7 DETERMINATION.**

FERC is cognizant of climate change, aware of the massive emissions created and fostered by the projects it permits but, once again, refused to confront the reality of these greenhouse gas emissions in both its NEPA analysis and in its section 7 determination that 200-300 serves the public convenience and necessity.

A. FERC Arbitrarily Refused to Determine the Upstream Emissions Attributable to Lines 200-300.

Greenhouse gas emissions from producing the gas that 200-300 would carry are "indirect effects" that NEPA required FERC to consider in the EIS; additional

gas production is a foreseeable consequence of this project. This court has affirmed both that NEPA requires FERC to gather information about these effects and that the Natural Gas Act requires FERC to consider and act on such information. *Sierra Club v. FERC,* 867 F.3d 1357, 372- 73 (D.C. Cir. 2017) ("*Sabal Trail"*); *Eagle County v. Surface Transp. Bd.*, 82 F.4th 1152, 1179 (D.C. Cir. 2023) (relying on *Sabal Trail* and holding that an EIS was required to consider upstream impacts of oil development as indirect effects of a new rail line).

FERC refused to do this. The Certificate addressed upstream emissions only in the middle of a footnote citing a previous FERC decision saying that if the pipeline is transporting gas intended for "export to other countries, the Commission will not consider the upstream or downstream GHG emissions" associated with the exported gas. 200-300 Certificate, R.213, P57, n.109 [JA685].

However, in the EIS, FERC promised that "the Commission will continue to determine, on a case-by-case basis, whether GHG emissions from upstream production activities are a reasonably foreseeable and causally connected result of a proposed project." R.199, 4-128 [JA612]. FERC said that to do this it needed information such as "the location of the supply source; whether transported gas would come from new or existing production; and whether there would be any potential associated development activities, and if so, its location." *Id*.

45

But FERC then refused to acknowledge that Petitioners *had* provided information concerning precisely "the location of the supply source", whether "the gas would come from new or existing production", etc. "Sierra Club Supplemental Letter on Tellurian Upstream Sources", R.192 [JA409]. This included the statements from Tellurian's chief of production that the company has "plans to drill 13 wells in the Haynesville shale [in 2022] that it will operate, as it looks to build sufficient feed gas supplies to support the first phase of its proposed Driftwood LNG export terminal in Louisiana" (*id.* at 2 [JA410]) and, "[w]e have been diligently growing our natural gas production and reserves in the Haynesville. These assets provide Tellurian with both cash flow and a physical hedge for Driftwood LNG." *Id*. Attach. 1, p.2 [JA414]. Driftwood's own consultant confirmed that "The growth in Haynesville output is especially beneficial for supply into the Project, since the production is already in Louisiana" (R.25, p.15 [JA178]) and that supplies in the region are "expected to continue to grow and a major contribution will be from northern Louisiana (Haynesville)." *Id*. at 26 [JA189].

Despite this, FERC refused to ask 200-300, the Terminal or their common parent, Tellurian, from where it planned to source the gas; nor did it require compliance with FERC's regulation that requires pipeline proponents to identify

potential sources of gas supply, 18 C.F.R. 157.14(a)(11).[14] *See Birckhead v. FERC*, 925 F.3d 510, 520 (D.C. Cir. 2019) ("It should go without saying that NEPA also requires the Commission to at least *attempt* to obtain the information necessary to fulfill its statutory responsibilities.")

FERC also ignored Healthy Gulf's comment pointing out that other agencies use a variety of modeling tools to estimate upstream greenhouse gas emissions from natural gas production, such as the Energy Information Administration's National Energy Modeling System which can predict, at the level of individual gas plays, how production will change in response to additional demand in a given region. Similar predictions are available using ICF's Integrated Planning Model, repeatedly used by EPA, the Department of the Interior's Market Simulation Model (MarketSim), and DOE's analysis of how U.S. energy markets will respond to LNG exports in general. R.173, 15-16 [JA375-376]. DOE has also demonstrated that available tools can estimate how incremental increases of natural gas production will "increase upstream GHG emissions". FERC violated NEPA

---

[14] FERC's explanation for this lapse is that, "since the advent of open access, natural gas shippers, not natural gas pipelines, have been responsible for obtaining natural gas supplies, and therefore, Exhibit H is not needed to determine whether adequate natural gas is available to supply the proposed project." 200-300 Certificate, R.213, P32 [JA675]. This makes no sense here, where the shipper and the pipeline are both parts of the same entity, Tellurian.

because it refused to estimate those indirect emissions or explain why the tools that other agencies have used to do so are unsuitable.[15] *Id*. at 16-17 [JA376-377].[16]

B. FERC Arbitrarily Refused to Characterize the Significance of Any Part of 200-300's Greenhouse Gas Emissions and Failed to Consider Them in Making Its Section 7 Determination.

FERC was adamant that it would not characterize any part of 200-300's greenhouse gas emissions (upstream, construction, operational, or downstream) as "significant" or "insignificant": "there currently are no accepted tools or methods for the Commission to use to determine significance, therefore the Commission is not herein characterizing these emissions as significant or insignificant." 200-300 Certificate, R.213, P63 [JA689].

But that is what NEPA requires it to do.  An environmental impact statement "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental

---

[15] The 200-300 EIS misleadingly suggests that *Birckhead* allows FERC to ignore upstream effects. R.199, 4-128 [JA612]. But *Birckhead* rejected the petitioner's challenge based on a failure to exhaust, not on the merits, while simultaneously chastising FERC for failing to perform any meaningful inquiry regarding upstream effects. 925 F.3d at 520.

[16] FERC has not claimed that it was not required to consider upstream emissions due to DOE involvement, or under *Sierra Club v. FERC*, 827 F.3d 36 (D.C. Cir. 2016) ("*Freeport"*), hence it cannot raise those defenses now. If it had raised them, they would fail because this case involves a section 7 certificate. *See* R.217, 20-23 [JA727-730].

impacts." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989). Thus, if greenhouse gas emissions are "significant", then FERC must "carefully consider" them in the EIS, along with relevant mitigation measures, including the "no-action" alternative. 40 C.F.R. 1502.14(C). NEPA also requires that the EIS shall include "the environmental impacts of the proposed action . . . and the significance of those impacts." 40 C.F.R. 1502.16(a)(1). *See Sabal Trail*, 867 F.3d at 1374 (requiring discussion of "significance" of indirect effects). And, of course, FERC's own regulations require that an EIS include "[t]he significant environmental impacts of the proposed action." 18 C.F.R. 380.7(a).

How significant are they? According to FERC, (and depending on the discount rate), "the reasonably foreseeable emissions from construction and operation of this project are calculated to result in a total social cost of GHGs equal to $629 million, $2.4 billion, and $3.6 billion, respectively." 200-300 Certificate, R.213, P62 [JA688].[17]

Even though it admitted that the downstream emissions from the gas that Entergy would burn were foreseeable, FERC did not go through the same exercise. FERC estimated Entergy's emissions at 1.93 million metric tons/year. *Id.* at P57 [JA685]. FERC didn't multiply these 1.93 million tons/year by the project's 20-

---

[17] As noted, this spread reflects the different discount rates of 5%, 3% and 2.5%. 200-300 Certificate, R.213, P62 [JA688].

year lifespan, which would come to 38.6 million tons $CO_2$e. And, while FERC was willing to calculate the impacts of the far more modest operations emissions by using the Social Cost of Greenhouse Gasses "for informational purposes," FERC didn't dare do that with 38.6 million tons, which is 17.5 times greater. Multiplying the $629 million, $2.4 billion, and $3.6 billion amounts that FERC gave for the construction and operations emissions by 17.5 yields $11 billion, $42 billion, and $63 billion in impacts, all from burning just 1.5% of the project's gas. Adding these "foreseeable" downstream combustion impacts to the construction/operations impacts yields total impacts of $11.6 billion, $44.4 billion, and $66.6 billion, respectively.

And, of course, none of these figures include the Terminal's greenhouse gas emissions, which were another 10 million tons/year, or 200 million tons over the life of the project, and should be considered together with 200-300's. Driftwood LNG Final Environmental Impact Statement, Accession No. 20190118-3018, p.4-161 [SA___].

In any event, NEPA does not allow an agency just to throw up its hands and say, "sorry, there is no way for us to figure this out." *See Mont. Wilderness Ass'n v. McAllister*, 666 F.3d 549, 559 (9th Cir. 2011) (when confronted with a difficult problem, "the proper response to that problem is for the [agency] to do the best it can with the data it has, not to ignore the [issue] completely").

CEQ's regulations have a provision addressing just this sort of situation: "[i]f the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because . . . the means to obtain it are not known, the agency *shall* include within the environmental impact statement . . . [t]he agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. 1502.21(c)(4) (emphasis added). In *Vecinos*, this court remanded to FERC a section 7 certificate precisely because it failed to address this requirement:

> [T]he Commission was required to address Petitioners' argument concerning the significance of 40 C.F.R. § 1502.21(c), and that its failure to do so rendered its analyses of the projects' greenhouse gas emissions deficient. On remand, the Commission must explain whether 40 C.F.R. §1502.21(c) calls for it to apply the social cost of carbon protocol or some other analytical framework, as "generally accepted in the scientific community" within the meaning of the regulation, and if not, why not.

6 F.4th at 1329-30.

FERC does not address, or even acknowledge, 40 C.F.R. 1502.21(c)(4) or *Vecinos* anywhere in the 200-300 EIS or the 200-300 Certificate, even though Healthy Gulf pointed out both in its comments on the draft EIS (R.173, p.29 [JA389] and again in its request for rehearing (R.217, pp. 10-11 [JA717-718]).

Of course, petitioners also pointed out to FERC in their comments and in their rehearing request that the Social Cost of Greenhouse Gasses is precisely just such a "theoretical approach or research method generally accepted in the scientific

51

community" that 1502.21(c)(4) calls for, can be applied to determine the

significance of GHG emissions, and is routinely used by other agencies for just

that purpose. R.173, p.29 [JA389]; R.217, p.11 [JA718]. In fact, in the Certificate

FERC even acknowledges it as such:

> While we have recognized in some past orders that social cost of GHGs may
> have utility in certain contexts such as rulemakings, we have also found that
> calculating the social cost of GHGs does not enable the Commission to
> determine credibly whether the reasonably foreseeable GHG emissions
> associated with a project are significant or not significant in terms of their
> impact on global climate change.

200-300 Certificate, R.213, P61[JA687] (footnotes omitted).[18] In other words,

while the SC-GHG "may have utility in certain contexts such as rulemakings",

FERC claims that it has "found" that it does not work when evaluating project-

level emissions. FERC cites to no such finding, because there is none. And other

agencies have no problem applying it to project-level decisionmaking, as FERC

has conceded. *Mountain Valley Pipeline, LLC*, 163 FERC ¶ 61,197 P281 n.772

(citing project-level examples from the Bureau of Ocean Energy Management and

Office of Surface Mining Reclamation and Enforcement). Additional examples

abound.[19]

---

[18] FERC has even conceded that "we do not dispute that it is generally accepted in
the scientific community." *Fla. Se. Connection, LLC Transcon. Gas Pipe Line Co.,
LLC Sabal Trail Transmission, LLC*, 164 FERC ¶ 61,099, P35 (Aug. 10, 2018).
[19] *See, e.g.*, Bureau of Land Management, Willow Master Development Plan,
Supplemental Environmental Impact Statement, Volume I, pp. 51-52,
https://eplanning.blm.gov/public_projects/109410/200258032/20073121/25007930

Not surprisingly, when asked to explain its "reasoning" behind its position (R.173, pp. 27-28 [JA387-388]; R.217, pp. 11-13 [JA718-720]) FERC refused to even acknowledge the question, let alone explain this distinction.  Rather than actually discuss – and take responsibility for – the consequences of its decision, FERC would rather make the utterly nonsensical claim that the impact of the 40 million tons of GHGs emitted by 200-300 that it is willing to own up to is somehow qualitatively different than the impact of 40 million tons emitted as a result of a regulation.

FERC has one other excuse for not using Social Cost of Greenhouse Gasses (or any other metric) - that "there are no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria." 200-300 Certificate, R.213, P61 [JA687]. But "monetized values" are not required or even necessary for making significance determinations, and there are few, if any, bright-line criteria for determining significance for *any* types of environmental impacts. Nevertheless, NEPA requires agencies to make informed determinations as to the significance of these impacts.

---

3/Willow%20FSEIS_Vol%201_Ch%201-Ch%205.pdf; U.S. Forest Service, *Roadless Area Conservation; National Forest System Lands in Colorado*; 81 Fed. Reg. 91,811, 91,815 (Dec. 19, 2016);
Maritime Administration, Final EIS for the Sea Port Oil Terminal Deepwater Port Project, App. BB (July 2022), https://www.regulations.gov/document/MARAD-2019-0011-5032.

The EIS "evaluated the impacts of the Project on geology, soils, groundwater, surface water, wetlands, vegetation, wildlife, fisheries, special status species, land use, recreation, visual resources, socioeconomics, environmental justice, cultural resources, air quality, climate change, noise, and safety and reliability" (R.199, ES-4 [JA468])  and determined that "with the mitigation measures recommended in the EIS, would result in some adverse environmental impacts, but none that are considered significant." (*Id.* at 2 [JA452]). FERC managed to determine what all the impacts would be for each of these, and then decide that with the appropriate mitigation measures there would be no "significant" impacts on any of these, and all without "monetized values".

For example, building and operating 200-300 will affect thousands of acres of land. *Id.* Table 4.3.1-1 [JA496]. 200-300 will affect more than a thousand acres of "compaction-prone" soils; more than 500 acres of soils with "poor revegetation potential" (*id*. at 4-13 [JA497]); almost a thousand acres of "prime farmland soils" (including the loss of 50 acres of such for "industrial use") (*id.*), etc., and "55 percent of the pipeline construction rights-of-way would overlap resulting in soils being impacted more than once." *Id.* at 4-17 [JA501]. But, '[b]ased on the overall soil conditions in the Project area, Driftwood's adoption of the FERC's Plan and Procedures regarding soil management, and the additional soil management practices that Driftwood would implement, we conclude that the Line 200 and Line

54

300 Project would not significantly alter the soils of the region." *Id*. No criteria for determining "significance" are mentioned anywhere.

Fisheries?  "By implementing the above measures, we conclude that impacts of the Project on fisheries would not be significant." *Id*. at 4-37 [JA521]. Vegetation? "[N]o significant impact on these vegetation communities are anticipated." *Id*. at 4-38 [JA522]. Wildlife and wildlife habitat? "These impacts are expected to be minor and not significant". *Id*. at 4-48 [JA532]. The project "would temporarily impact 889.1 acres of land and operations would permanently affect 393.7 acres" (*id*. at 4-73 [JA557]), but "the Project would not have a significant effect on land use resources" *Id*. at 4-74 [JA558].

 FERC didn't use monetized values for making any of these significance determinations, yet cannot explain why it could do so for all of these impacts, but not impacts from greenhouse gasses.

Ultimately, FERC's contortions served their purpose –by refusing to categorize any of 200-300's greenhouse gas emissions as "significant", FERC avoided the Natural Gas Act's mandate that it factor environmental consequences into its determination under section 7 whether 200-300 served the public convenience and necessity. FERC "will issue a certificate . . . only if a project's public benefits (such as meeting unserved market demand) outweigh its adverse effects (such as a deleterious environmental impact on the surrounding

Community).” *City of Oberlin*, 937 F.3d at 602. Violating NEPA was bad enough;

violating the Natural Gas Act by willfully closing its eyes to emissions that would

impose (in the middle case) $44 billion in damages in order to approve a

completely unnecessary $1.5 billion pipeline is truly irresponsible.[20]

## V.    REMEDY

Vacatur is the ordinary remedy for unlawful agency action. *Standing Rock*

*Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021);

and 5 U.S.C. 706(2)(A) (“The reviewing court shall . . . set aside agency action . . .

found to be” unlawful).

In rare cases, the court may instead remand for the agency to correct its

errors, which turns on two factors: “the seriousness of the order's deficiencies (and

thus the extent of doubt whether the agency chose correctly) and the disruptive

consequences of an interim change that may itself be changed.”  *Allied-Signal, Inc.*

---

[20] In could be a lot worse; the EIS applied the Social Cost of Greenhouse Gasses to the GHG emissions if all of 200-300's gas were burned, which “would result in 102.35 million metric tpy of $CO_2e$ emissions per year.” FEIS, R.199, 4-125 [JA609]. Adding up the operational and these downstream emissions and, using discount rates of 5%, 3% and 2.5% (R.199, 4-127 [JA611] (emphasis added)) “emissions from operation of this Project is calculated to result in a total social cost of GHGs equal to **$25.3 billion, $98.2 billion, and $149.3 billion**, respectively (all in 2020 dollars). Using the 95th percentile of the social cost of GHGs using the 3 percent discount rate, the total social cost of GHGs from the Project is calculated to be **$298.8 billion** (in 2020 dollars).” R.199, 4-128 [JA612] (emphasis added).

*v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-151 (D.C. Cir. 1993) (internal

quotation marks omitted). Neither of these exceptions applies here.

FERC authorized a section 7 pipeline in flagrant violation of the Natural Gas

Act, which requires that such pipelines serve the public convenience and necessity.

FERC's justification for 200-300 was an affiliate precedent agreement to provide

the Driftwood Terminal with all of its feedstock, after previously relying on an

earlier affiliate precedent agreement between the same parties as justification for

issuing a section 7 certificate to the Mainline.  There is – literally – no need for this

pipeline.

 Second, "NEPA violations are serious notwithstanding an agency's

argument that it might ultimately be able to justify the challenged action." *Standing*

*Rock*, 985 F.3d at 1053. Because the errors here stem from a lack of requisite

analysis—not merely FERC's failure to fully document its decision—FERC is

unlikely to be able to substantiate its decision on remand. *See id.*  Moreover, FERC

willfully concealed its knowledge that Lines 200-300 would be the Terminal's sole

gas supply, which required that both Line 200-300's and the Terminal's impacts be

scrutinized as a single project under NEPA.

Finally, vacatur should have no disruptive consequences for Driftwood,

since the Driftwood Terminal has a ready alternative source of gas via the

Mainline. Even if there were such consequences, they would not outweigh the

importance of not allowing FERC to give out section 7 certificates without any demonstration of need, or of properly reconsidering Lines 200-300 along with the Terminal in a single NEPA analysis, and properly weighing the significant impacts of the project's foreseeable greenhouse gas emissions. *See id.* at 1051, 1054 (upholding vacatur despite its significant economic consequences because allowing the project to proceed without adequate analysis would subvert NEPA's objectives).

## CONCLUSION

For the reasons given herein, the Lines 200-300 Certificate should be vacated.

Respectfully submitted,

*/s/ David Bookbinder*
David Bookbinder
Law Offices of David Bookbinder
107 S. West Street, Suite 491
Alexandria, VA 22314
(301) 751-0611
david.bookbinder@verizon.net

*Attorney for Healthy Gulf and Sierra Club*

58

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(g)(1), I certify that the foregoing brief complies with:

1. the type-volume limitations established by this Court's November 2, 2023 briefing order, setting a limit of 13,000 words for Petitioners' joint opening brief, because this brief contains 12,937 words, excluding the parts of the brief exempted by Rule 32(f); and

2. the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point) using Microsoft Word (the same program used to calculate the word count).

*/s/ David Bookbinder*
David Bookbinder
Law Offices of David Bookbinder
107 S. West Street, Suite 491
Alexandria, VA 22314
(301) 751-0611
david.bookbinder@verizon.net

*Attorney for Healthy Gulf and Sierra Club*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of April, 2024, I have served the

foregoing Opening Brief for Petitioners, including the Addendum thereto, on

all registered counsel through the Court's electronic filing system (ECF).


*/s/ David Bookbinder*
David Bookbinder
Law Offices of David Bookbinder
107 S. West Street, Suite 491
Alexandria, VA 22314
(301) 751-0611
david.bookbinder@verizon.net


*Attorney for Healthy Gulf and*
*Sierra Club*